**Louis Charles KING, Appellant,**

v.

**UNITED STATES of America, Appellee.**

**No. 461, Docket 77–2106.**

United States Court of Appeals, Second Circuit.

Argued Jan. 9, 1978.

Decided May 5, 1978.

---

**31.** *Id.* at 637.

Henry J. Boitel, New York City, for appellant.

Paul V. French, U. S. Atty. for the Northern District of New York, Syracuse, N. Y. (Gustave J. Di Bianco, Asst. U. S. Atty., Syracuse, N. Y., of counsel), for appellee.

Before FEINBERG and OAKES, Circuit Judges, and WYATT, District Judge.*

WYATT, District Judge:

This appeal raises several questions concerning the conduct of a criminal jury trial at Utica in late February and early March, 1973. Appellant King and three co-defendants were on March 1, 1973, found guilty by the jury of violations of sections of Title II of the Consumer Credit Protection Act (18 U.S.C. §§ 891 and following; sometimes referred to as prohibiting "loan sharking" activities). Judge Lloyd F. MacMahon of the Southern District of New York presided at the trial, sitting by designation.

King, the appellant, moved in January, 1977, in the court below under 28 U.S.C. § 2255 to vacate the sentence imposed upon him by Judge MacMahon on May 25, 1973. He also moved at the same time for several types of what was called "interim relief", including that Judge MacMahon disqualify himself (movant cited in this connection 28 U.S.C. §§ 144 and 455).

By order with opinion filed July 29, 1977, Judge MacMahon refused to disqualify himself and denied the motion in all other respects.

This appeal followed. In addition to questions concerning the conduct of the trial, the appeal is directed to the refusal of Judge MacMahon to disqualify himself.

We affirm the order from which the appeal is taken.

1.

On January 18, 1973, a grand jury in the Northern District of New York handed up an indictment (73 Cr. 9) charging King and four others in seven counts with violations of 18 U.S.C. § 892(a) and 18 U.S.C. § 894. Six of the counts charged substantive offenses and the seventh charged a conspiracy to violate 18 U.S.C. § 894. One of the co-defendants (Marrone) was thereafter severed.

Trial of King and three co-defendants began on Tuesday, February 20, 1973. At the beginning, a motion by the government to sequester the jury was granted. After the jury was selected, it was put in the charge of United States Marshals and lodged at the Ramada Inn.

The trial judge, on the first day of taking evidence, gave a strong admonition to the jury not to listen to anything about the case on the radio nor to watch anything about it on television, nor to read anything about it in newspapers. He advised the jurors that disregard of those directions would be punished as a contempt of court, would have serious consequences. Tr. 207–208. The substance of this admonition was repeated by the Court to the jury at least seven times during the trial. Tr. 477–78, 595, 654, 742, 814, 859, 961.

The trial was recessed on Friday afternoon, February 23.

On Saturday evening, February 24, at about 8 o'clock King in an automobile went to the house of Kelly, agent in charge of the FBI office in Utica. King got out of the car, walked to a front window, punched out the window and threw into the house a hand grenade. Apparently the FBI had some advance warning of the deed and Kelly with his family had been evacuated. Fortunately also the grenade did not explode. There were FBI agents and police officers in the area and after the grenade

* Senior District Judge of the Southern District of New York, sitting by designation.

was thrown there was an exchange of shots while King was running back to his car. He may have been wounded but managed to drive the car away. About fifteen minutes later, officers and agents found King and the car a few miles away in the parking lot of the Ramada Inn, the very place where the jury had been sequestered. Why King went to the Ramada Inn is not made to appear. In any event, there was a further exchange of shots in the parking lot and King was very seriously wounded. According to one of the newspaper accounts (App. 141), another grenade (a "destructive device" as defined in the National Firearms Act (26 U.S.C. § 5845(f))), was found on or near King's person. King was taken by ambulance to a nearby hospital, St. Luke's Memorial Center. There was extensive publicity about the incident.

When the trial resumed on Monday morning, February 26, counsel for King moved for a mistrial, advising the Court that King might not be out of the hospital for two months. The Court denied the motion, stating that the trial would proceed in King's absence since his absence was the result of his own misconduct, amounting to a voluntary waiver of his right to be present at the trial. Counsel for King then asked that the jury be questioned to see if the members had learned anything about the shooting incident. The Court denied this request on the ground that the jury had been sequestered, that all telephone calls of the jurors had been screened, and that the Court had directed that the jurors could not read newspaper accounts and could not listen to or see radio and television reports. Counsel for King then moved that the trial be conducted in the hospital in the presence of King. This motion was denied as not feasible. King's counsel then moved that King be allowed to testify in the hospital in his own defense. On this motion, decision was reserved. Later, the motion was granted.

Trial resumed before the jury on Monday morning, February 26, and shortly before the luncheon recess the government rested its case.

On Tuesday, February 27, the trial was moved to an auditorium in the hospital. The surgeon attending King testified to the Court, outside the presence of the jury, as to King's physical condition. The Court looked at King in his room to satisfy himself that his appearance would not prejudice him with the jury. King was then moved to the auditorium and testified in his defense. At its conclusion, the Court gave the already described admonition to the jury, adding that they were not to speculate about King being in the hospital. "Suffice it to say over the weekend he was injured" (Tr. 859).

Trial resumed in the Courthouse that same day and summations began.

On Wednesday, February 28, the case was given to the jury.

On Thursday, March 1, the jury returned a verdict finding King and the other defendants guilty on all counts as charged. King then moved for judgment of acquittal and for a new trial, asserting very many of the grounds now urged on this appeal five years later. The motion was in all respects denied. During the argument of the motion, counsel for King expressed disbelief that King had in fact thrown a grenade into Kelly's house and then, to avoid shots and apprehension, had run away. Thereupon, the Court decided to have a hearing to establish the facts. An FBI agent testified to the incident at Kelly's house, counsel for King declined to cross-examine and declined to produce any evidence. The Court found the facts to be as related hereinabove. The Court rejected the absence of defendant as any reason for having delayed the trial, citing *Illinois v. Allen*, 397 U.S. 337, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970), as having established the principle that absence from a trial caused by misconduct of a defendant is a voluntary waiver of the right to be present at the trial.

On May 25, 1973, sentence was imposed by Judge MacMahon on King. He was fined $10,000 on each of the seven counts on which he was convicted and imprisoned for twenty years on each count, the sentences of imprisonment to run concurrently.

On May 8, 1973, an indictment (73 Cr. 94) in four counts had been returned charging King with different offenses based on the throwing by him of the hand grenade into the house of FBI Agent Kelly. On November 19, 1973, King pleaded guilty to unlawful possession of an unregistered hand grenade, a "destructive device" and a "firearm", charged in count one as a violation of the National Firearms Act (26 U.S.C. §§ 5851, 5845(a) and (f), 5861(d), 5871). On November 30, 1973, Judge Foley sentenced King on this conviction to five years imprisonment, consecutive to the sentences on the loan sharking convictions (73 Cr. 9). On motion of the government, the other three counts of indictment 73 Cr. 94 were dismissed.

### 2.

King appealed his conviction in the loan sharking case (73 Cr. 9) to this Court and on November 28, 1973, the judgment of conviction was unanimously affirmed, without opinion. 486 F.2d 1397 (Moore, Hays, and Timbers, C. JJ.) Certiorari was denied on April 22, 1974. 416 U.S. 958, 94 S.Ct. 1974, 40 L.Ed.2d 309.

### 3.

A motion for King for reduction of sentence (Fed.R.Crim.P. 35) was denied by Judge MacMahon by order dated September 12, 1974.

On April 9, 1975, counsel for King and for the other three defendants filed a motion under 28 U.S.C. § 2255 to vacate their sentences. This proceeding seems to have been given the file number 75 Civ. 172. The motion also asked at the same time for a new trial and for a hearing to determine whether the trial jurors should be questioned. The ground urged was that the jurors must have learned from newspapers, radio, and television of the shooting incident involving King, to the prejudice of all of the defendants.

The government filed a memorandum opposing the motion.

In early July, 1975, King (serving his sentence in an institution) wrote to his counsel asking that the motion be withdrawn, because he wished to do more research work before filing such a motion.

Under date of July 25, 1975, counsel for King wrote to the Clerk of the District Court that the motion should be withdrawn so far as King was concerned.

Under date of September 5, 1975, by order with opinion, Judge MacMahon denied the motion as to King as well as to the other movants. Judge MacMahon apparently treated King's Section 2255 motion as not having been properly withdrawn.

### 4.

More than a year later and on January 7, 1977, King, represented by new counsel, filed a second motion to vacate his sentence under 28 U.S.C. § 2255. Such a vacatur was the "ultimate relief" sought by the motion; various forms of "interim relief" were also sought, including the disqualification of Judge MacMahon. A protective order was sought prohibiting any communication with prospective witnesses and any dissemination to the press of the fact of the pendency of the proceeding. By order filed January 18, 1977, Judge MacMahon denied the motion so far as it asked for a protective order, citing *Nebraska Press Association v. Stuart*, 427 U.S. 539, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976); he did, however, order that the file be sealed.

Thereafter, the government filed a memorandum opposing the motion for "ultimate relief" and King filed a reply memorandum.

A careful opinion was filed by Judge MacMahon on July 29, 1977, with an order denying the motion in all respects.

There was then this appeal.

### 5.

The first issue is whether Judge MacMahon should have disqualified himself from hearing and deciding the motion. In this connection, King first invokes 28 U.S.C. § 144 which provides that a judge shall not proceed further in a matter when a party files "a timely and *sufficient* affidavit that

the judge has a *personal* bias or prejudice either against him or in favor of any adverse party . . . ." (emphasis supplied). King also invokes 28 U.S.C. § 455, a statute which in its present form was enacted in 1974, which includes the operative words ("personal bias or prejudice") from Section 144, which adds further grounds for disqualification, and which largely replaces Section 144. The relevant provisions of Section 455 are as follows:

"(a) Any . . . judge . . . of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.

(b) He shall also disqualify himself in the following circumstances:

(1) Where he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding;

\*    \*    \*    \*    \*    \*

(5) He . . . (iv) is to the judge's knowledge likely to be a material witness in the proceeding."

As counsel for King correctly points out, Section 455 was passed, among other reasons, to eliminate the "duty to sit" concept which had found expression in many judicial opinions. Some of these are cited in the memorandum of Mr. Justice Rehnquist in *Laird v. Tatum,* 409 U.S. 824, 837, 93 S.Ct. 7, 34 L.Ed.2d 50 (1972). While Judge MacMahon quoted one such expression (App. 175), it is not true, as argued by counsel for King (Brief, pp. 21, 27) that this was the rationale of his opinion below nor did he rely on the concept in refusing to disqualify himself.

■ The grounds urged for disqualification are for the most part rulings made by Judge MacMahon during the trial or statements made by him in the course of his judicial duties: (1) denial of King's moves to poll the jurors as to the publicity, (2) description of King at the time of sentence, (3) length of the sentence, and (4) refusal to consider the earlier 28 U.S.C. § 2255 motion as having been withdrawn by King. Nothing of this kind, what the judge has learned from or done in the proceedings before him, is any basis for disqualification; to be sufficient for disqualification the alleged bias or prejudice must be from an extrajudicial source. *United States v. Grinnell Corp.,* 384 U.S. 563, 583, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966); *United States v. Bernstein,* 533 F.2d 775, 784–85 (2d Cir. 1976); *United States v. Sclafani,* 487 F.2d 245, 255–56 (2d Cir. 1973).

■ Another ground urged for disqualification is that trial counsel for King sent to Judge MacMahon a letter from King "which cast aspersions upon the motivations and intent of Judge MacMahon" (Brief for Appellant, p. 25). This letter may very well establish King's feelings toward Judge MacMahon, but has no tendency to show the latter's feelings toward King, as was pointed out by Judge Feinberg in a similar situation in *United States v. Wolfson,* 558 F.2d 59 (2d Cir. 1977).

■ Finally it is urged that, if King were granted an evidentiary hearing, Judge MacMahon would be a witness to identify a marshal who was in charge of the jury and to testify to what that marshal told him about possible exposure of the jurors to publicity. We do not believe that any showing is made sufficient to require such a hearing. But in any event—and assuming that Judge MacMahon would be a witness—this would not disqualify him *prior* to the hearing, specifically from determining whether a hearing should be held. *Panico v. United States,* 412 F.2d 1151, 1155–56 (2d Cir. 1969).

We find that Judge MacMahon acted properly in refusing to disqualify himself.

**6.**

King is here complaining, for at least the third time, that the jurors were exposed during the trial to publicity about King's murderous grenade throwing and about the consequent injuries to King himself. This point was raised on the direct appeal from the conviction and on the first Section 2255 application.

King presents on this third occasion a strange document, a one-page typed paper

captioned "affidavit" (App. 307). It purports to be signed by a Mrs. Helen Postal. The typed paper recites that she was a juror at the King trial. By whom the paper was prepared and typed is not revealed but, as will be seen, it was undoubtedly done by a private investigator hired for King. The Postal paper states how the jury stayed at the Ramada Inn and has blanks for the name of the signing juror and for check marks to indicate that the juror did or did not read articles about the case, did or did not watch news briefs of the case and was or was not aware why King was in St. Luke's Hospital. There is what purports to be a signature of Mrs. Postal and checks purporting to indicate that she did read articles, did watch news briefs and was aware why King was in the hospital. The signed paper is recited to be "sworn to and attested" before a notary public who purports to have signed "Mr. Vict De Santia." Who and where this person is has not been revealed, nor is any data given as to his notarial qualification nor is there any notarial seal. The paper purports to be signed as a witness by a "Michelle Malina" from whom a one-page affidavit is submitted which recites that she lives in Utica but which gives no other information about her nor as to what, if any, her connection is with the King case.

The authentication of the Postal statement and the Malina affidavit is by counsel for King on this appeal, who says that King sent him the Postal paper and that he (counsel) engaged a licensed private investigator who produced the Malina affidavit.

King also submits an unsigned proposed affidavit (App. 309–315) for the Manager of the Ramada Inn. The authentication of this document is by counsel for King on this appeal who says that the proposed affidavit is the substance of what the Manager told counsel over the telephone but that the proposed affidavit could not be executed because the directors of Ramada Inn told the Manager not to do so. The proposed affidavit is designed to show how the jurors could have obtained some knowledge of the King shooting incident but is no more than speculation as to this.

On the basis of this weakly authenticated, vague, and speculative material as to one juror, King contends that he is entitled to an evidentiary hearing at which the jurors can be questioned and cross-questioned as to their possible exposure to prejudicial publicity.

■ There is a judicial reluctance, for sound and easily understood reasons, "to inquire into the state of mind of any juror and into the conduct of the jurors during their deliberations." *United States v. Dioguardi*, 492 F.2d 70, 79 (2d Cir. 1974). This is to avoid harassment of jurors, inhibition of deliberation in the jury room, a deluge of post-verdict applications mostly without real merit, and an increase in opportunities for jury tampering; it is also to prevent jury verdicts from being made more uncertain. *United States v. Crosby*, 294 F.2d 928, 950 (2d Cir. 1961), *cert. denied*, 368 U.S. 984, 82 S.Ct. 599, 7 L.Ed.2d 523 (1962).

■ To overcome this reluctance and to authorize a post-verdict inquiry, there must be "clear evidence", "strong evidence", "clear and incontrovertible evidence", "substantial if not wholly conclusive evidence." *United States v. Dioguardi* above cited at 78, 79, 80.

■ We are forced quickly to conclude that the evidence for King falls far short of what would be required to justify an inquiry at this late date into the possible knowledge by jurors of the King publicity and its possible effect on them. The frail and ambiguous showing here contrasts sharply with the "specific and detailed factual assertions" in *Machibroda v. United States*, 368 U.S. 487, 496, 82 S.Ct. 510, 7 L.Ed.2d 473 (1962), on which King relies for an evidentiary hearing, which was described by the majority opinion as "not far from the line", and from which three of the justices dissented. Moreover, it cannot be ignored that the prejudicial publicity, of which King now complains, was the foreseeable result of the voluntary act of King himself.

It is puzzling in this connection to find a contention by counsel for King that such voluntary act was found by Judge MacMahon without "the benefit of a truly adversary hearing" (Brief, p. 44). After the jury verdict, there were motions by all defendants. In presenting his motions, the then counsel for King denied that King had done the grenade acts claimed by the government (App. 103). Thereupon, Judge MacMahon conducted a hearing to determine the facts. An FBI Agent testified to King's going to Agent Kelly's home and punching in a front window; then to circumstances establishing that King threw a grenade into the house. Then counsel for King declined to cross-examine and declined to present any evidence. App. 121–123. If there was no "truly adversary hearing", it can be seen that this was entirely a decision made by the then counsel for King.

We note that Judge MacMahon, after the jury verdict, instructed the jury "again not to talk about this case. If anybody tries to talk to you, with you, you are to contact the FBI immediately" (App. 89). Counsel for King appear reasonably to have interpreted this instruction to prohibit them from interviewing the jurors (App. 266); they did, however, hire a private investigator who seems to have talked to at least one juror, Mrs. Postal.

The vindication of the public interest in protecting jurors after the discharge of their responsibilities has been a troublesome problem for the judiciary.

This Court has held that a district judge may provide that questioning of jurors after a verdict be conducted only under supervision of the trial court. In *United States v. Brasco*, 385 F.Supp. 966, 970 fn. 5 (S.D.N.Y.1974), Judge Cannella held:

" . . . all post-trial questioning of jurors must only be conducted under the strict supervision and control of the court, with inquiry restricted to those matters found by the court as both relevant and proper."

On appeal, the quoted language was specifically approved by this Court in affirming the judgment of conviction. 516 F.2d 816,

819 fn. 4, *cert. denied*, 423 U.S. 860, 96 S.Ct. 116, 46 L.Ed.2d 88 (1975). See also *Miller v. United States*, 403 F.2d 77, 81–84 (2d Cir. 1968); *United States v. Driscoll*, 276 F.Supp. 333 (S.D.N.Y.1967; McLean, J.); *United States v. Sanchez*, 380 F.Supp. 1260, 1265–66 (N.D.Tex.1973; Brewster, J.), *affirmed*, 508 F.2d 388 (5th Cir. 1975).

■ The direction of Judge MacMahon to the jurors is not proper ground for complaint by King. If there were any real justification for interviewing the jurors, application for this could be made to Judge MacMahon and any interviews conducted under his control and supervision.

### 7.

It is contended for King that in the grenade throwing incident (Brief, pp. 45–47), the state and federal officers who were at the target house and who pursued King, used excessive force to capture him and thereby prevented him from attending his trial. This, it is asserted, was a violation of his constitutional right to attend that trial; at least, an evidentiary hearing should determine whether excessive force was used.

We cannot accept this contention.

King may, conceivably, have some claim for money damages against the officers if they used excessive force, this claim being enforceable either under 42 U.S.C. § 1983 or in an action patterned under *Bivens v. Six Unknown Named Agents, etc.,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). As to this, we express no opinion.

■ But certainly any use of excessive force by the officers would not change the voluntary character of the act by King which preceded such conduct by the officers. The fault of the officers, if any there was, would not affect the admissibility of any evidence at the trial, nor alter the fact that King's failure to attend the trial was a reasonably foreseeable consequence of his own choice to attack the home in Utica of FBI Agent Kelly.

The order of the District Court filed July 29, 1977, denying a motion for disqualification of the assigned judge and denying relief under 28 U.S.C. § 2255 is affirmed.