**James IDA, Movant,**

**v.**

**UNITED STATES of America, Respondent.**

**No. 00 Civ. 8544(LAK).**
**No. S196CR.430(LAK).**

United States District Court, S.D. New York.

March 27, 2002.

Flora Edwards, Sewaren, NJ, for Movant.

Barbara Ward, Maria Barton, Assist. U.S. Attorneys, James U.S. Atty., for U.S.

**MEMORANDUM OPINION**

KAPLAN, District Judge.

Movant, reputedly the former *consigliere* of the Genovese organized crime family, was convicted after a lengthy jury trial of racketeering conspiracy, racketeering, eight substantive crimes which were alleged also as acts of racketeering, and conspiracy to defraud the United States. Three of the acts of racketeering, two of which were alleged also as substantive counts, were murders or conspiracies to commit murder. He was sentenced to a term of life imprisonment, five years of supervised release, a mandatory special assessment, and a $1 million forfeiture. On April 30, 1999, the Second Circuit substantially affirmed the convictions, reversing only racketeering act 2(a) and count nine, the DeSimone murder conspiracy.[1]

On October 15, 1999, Ida moved for a new trial based on allegedly newly discovered evidence. The Court denied the mo-

---

1. *United States v. Bellomo,* 176 F.3d 580, 595 (2d Cir.), *cert. denied,* 528 U.S. 987, 120 S.Ct.

tion on December 14, 1999, and the Second Circuit affirmed on September 14, 2000.[2]

Ida now moves pursuant to 28 U.S.C. § 2255 to vacate his conviction. Much of the application focuses on allegedly newly-discovered evidence concerning the murder of Hickey Dilorenzo and the conspiracy to murder Dominic Tucci. The relevant evidence is summarized in the Second Circuit's opinion and need not be repeated here.[3] Movant alleges also that the government violated its disclosure obligations under *Brady v. Maryland*[4] and *Giglio v. United States;*[5] that he was deprived of the effective assistance of counsel; that *Apprendi v. New Jersey*[6] requires reversal of the criminal forfeiture verdict; and that the testimony of two of the government's witnesses should have been excluded under *United States v. Singleton.*[7] At the heart of the motion, however, are claims of jury tampering and juror misconduct as to which Ida seeks discovery and a hearing. Since all or substantially all of his motion would be mooted if he were entitled to relief on either of these theories, the Court deals with them first.

### I. Facts

Ida seeks relief on the basis of a combination of a mention late in the trial of an investigation concerning possible jury tampering, an affidavit of a former bar owner who claims to recall statements made during and after the trial by someone who allegedly claimed to have been a member of the anonymous jury in this case, and the acquittal of codefendant Louis Ruggiero.

### A. The Trial Record

Just after the start of this eight week long trial, one of the jurors wrote the Court regarding an incident involving his car. The transcript contains the following colloquy:

"THE COURT: Good morning, folks."

"I came on the bench because we have two notes from jurors. Juror in seat number 3 writes, 'Just wanted to bring to your attention my car windshield was smashed on day one of trial. Maybe a coincidence, but I wanted it to go on record in case of any other event.'"
* * *

"Do counsel wish to be heard on what, if any response should be made?"

"MR. HOFFMAN [IDA'S COUNSEL]: I do. I would ask the Court to ask that witness, I am sorry, that juror if this activity has in any way, shape or form prejudiced or concerned or caused any bias in their thinking. And the reason I say that is particularly the way in which the note was phrased 'in case there are any other incidents,' as though it was not something random but perhaps as a result of participation in the trial. And I would ask the Court to inquire if that is the thinking of that juror because, obviously, if it is, I would have some concern."[8]

The juror then was brought in, and the following exchange occurred:

"THE COURT: Come on in. Why don't you come up here by where the

---

447, 145 L.Ed.2d 364 (1999).

2. *United States v. Ida*, 2000 WL 1340366, 225 F.3d 647 (2d Cir.2000).

3. *Bellomo*, 176 F.3d at 588–90.

4. 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

5. 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972).

6. 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000).

7. 144 F.3d 1343 (1998), *rev'd en banc,* 165 F.3d 1297 (10th Cir.1999).

8. Tr. 383 ln. 3–23.

cart is and we want to talk to you briefly about your note. Right up here, no great formality."

"My question to you is this: Do you feel as a result of this incident with your windshield that you have a bias one way or the other in this case?"

"A JUROR: No, not at this point. If it happens a couple of times I might. But not at this point. I thought it was just a coincidence, but I thought it would be wise just to let you know, just to go on the record."

"THE COURT: You are confident you can judge the case fairly and impartially without regard to that incident at this point."

"A JUROR: Yes. At this point." [9]

There was no request to strike the juror and no request for further questioning by any party. There is no suggestion of any further incidents of this nature involving this or any other juror.

Many weeks later, just before the government presented its rebuttal summation, defendant Ruggiero's attorney brought the following to the Court's attention:

"MR. JACOBS: ... Your Honor, at 8:15 this morning I received a phone call from one of Mr. Ruggiero's daughters, Ida Ruggiero, telling me that she had been subpoenaed by the FBI at about 11:30 last night for jury tampering. I assume it is with regard to this case. I know nothing about this situation, your Honor, and possibly we should be enlightened as to what is going on."

"[AUSA] BOXER: Your Honor, I know nothing about the situation either respecting Ms. Ruggiero."

"MR. JACOBS: Yes. Doug Lankler is the assistant. I called the assistant. I left a message on his phone. I didn't hear back from him."

"THE COURT: I suggest that you try to get in touch with the assistant. All right." [10]

The record reveals nothing further on this issue.

None of the defendants made any claim regarding either of these matters either in their post-trial motions, on direct appeal, or in a motion for a new trial.

### B. Other Evidence Regarding Juror No. 3

In the spring of 1997, after he was convicted but prior to sentencing, Ida learned that one William Sullivan, the owner of a bar in Rockland County, claimed that a man named John Lynch, who said he was a juror in this case,[11] had discussed the trial during its progress and subsequently returned to the bar and told Sullivan that defendant Ruggiero had been acquitted and "owes him a favor."[12] Ida reported this information to his trial attorney, Jeffrey Hoffman, and hired a private investigator to look into the matter.[13] Hoffman and the investigator each interviewed Sullivan. Sullivan allegedly told Hoffman that Lynch had discussed the trial during its progress and later made the alleged comment about Ruggiero.[14] Hoffman, accord-

---

**9.** *Id.* 385 ln. 11–25.

**10.** Tr. 5006 ln. 8–21.

**11.** The Court has ascertained that Juror No. 3 in this case was named John Lynch.

**12.** Ida Aff., May 7, 2001, ¶¶ 2–5.

**13.** *Id.* ¶¶ 6–7.

**14.** Hoffman Aff. ¶¶ 5–6.

An unsworn memorandum by the investigator reported that Sullivan stated also that Lynch complained that his car windows were broken while he was in court and said that "these 'ITALIANS' were not going to scare him" and that "the cops wouldn't lock someone up and bring them to trial if

ing to his affidavit, decided to seek additional evidence "to make the strongest case possible." [15] Nothing else turned up, however, and the issue was not raised until the present motion.

Ida now—years later—has come forward with an affidavit from Sullivan which states that one John Lynch told him early in 1997 that he was a member of a jury, that his car windows had been broken while he was in court, that he believed the incident was connected to the trial, that "these Italians were not going to scare him," that the defendants' stares in the courtroom "were not going to intimidate him," and that the police would not lock someone up and bring him to trial if he were not guilty. Following Ida's conviction for conspiracy to murder, and Ruggiero's acquittal of murdering, DeSimone in aid of racketeering, Lynch allegedly told the bar owner that "Ruggiero owed him a favor." [16]

### C. Other Evidence Regarding Alleged Jury Tampering

The evidence outside the trial record concerning the government's inquiry late in the trial into possible jury tampering— which accounted for the brief exchange initiated by Ruggiero's lawyer that is quoted above—consists of a number of affidavits submitted by Ida as well as submissions by the government and the Court's own inspection of the grand jury minutes.

According to Ruggiero's daughter, Lucille, an FBI agent visited her home and

insisted that she appear at the Bureau's office on the following day at which time she was told that the government had taped telephone conversations between her and her father in which the father told her to go see "Mark" at the fish market.[17] One Mark Lucente also was contacted by the FBI and, according to his affidavits, was asked before the grand jury whether he knew Ida, Ruggiero, or any of the jurors. He admitted knowing Ruggiero, but denied any jury tampering.[18]

The government, for its part, acknowledges that it investigated possible jury tampering during the trial. It has submitted declarations indicating that no sitting jurors were interviewed in connection with the investigation and that this was a deliberate strategy to avoid any possible taint of the trial jurors. It interviewed one former juror, an individual who had been dismissed from the jury well before the interview, on April 23, 1997, following the return of the verdicts on the substantive charges. That interview was expressly authorized by Judge John F. Keenan.[19] The investigation did not result in the filing of any charges.

As Ida seeks to link the alleged comments made by Lynch to William Sullivan with the government's much later investigation, it is important to focus on the lack of evidence of a connection between the two. Ida's theory begins from the premise that the John Lynch who allegedly spoke to Sullivan was Juror No. 3, and the Court so assumes for purposes of the motion.

---

they were not guilty." *Id.* (attached memorandum).

15. *Id.* ¶ 8.

16. Sullivan Aff. ¶¶ 5–6. Ida's reply papers contain also an affirmation of Michael Negri, the former bar owner's attorney and brother-in-law, who attributes similar statements to the former bar owner. Negri's account, insofar as it is offered to prove that Lynch made

the statements attributed to him by Negri's client, is hearsay because it is offered to prove the truth of the former client's statements to Negri.

17. Ruggiero Aff., *passim*.

18. Lucente Aff., May 17, 2001, ¶ 4.

19. Ward Decl. ¶¶ 2–5; Ward Supp. Decl. ¶¶ 2–4.

He then implies that Lynch's alleged comment, following Ruggiero's acquittal, about Ruggiero owing him a favor and the FBI's interest in Ruggiero's daughter during its later investigation suggests a relationship between these events.

Having considered the affidavits of Lucille Ruggiero and Mark Lucente and reviewed the grand jury minutes *in camera*, the Court is satisfied that there is no evidence connecting the two episodes. The most that can be said for Ida's position is that the government *suspected* at one point that Lucente, who knew Ruggiero,[20] may have known one of the jurors.[21] But Lucente, who has furnished Ida with two affidavits in support of this motion, does not so state, much less even hint at any improper contact with Lynch or any other juror.

## II. Discussion

### A. Availability of Claim of Alleged Jury Improprieties Under Section 2255

The question whether claims of improprieties going to the impartiality of the jury are cognizable on habeas corpus has been a subject of some dispute for a number of years. Some courts have held that such claims implicate the Sixth Amendment right to trial before an impartial jury and therefore are appropriately raised on habeas.[22] Others have said that a motion for a new trial is the proper vehicle.[23]

The significance of the dispute goes to timeliness. The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") set time limits for the commencement of habeas proceedings.[24] The 1998 amendment to Criminal Rule 33 and its predecessor set different limitations [25] which in some cases will be stricter and in others more charitable than the AEDPA limit. In this case, the government concedes that Ida's motion, if regarded as one under Section 2255, is timely under AEDPA. It concedes also that the motion, if treated as a motion for a new trial, would be timely under the pre–1998 version of Rule 33. It suggests, however, that the 1998 amendment applies, that the deadline for the motion under the new rule was on April 24, 2000, and that Ida's motion therefore is untimely.

■ The Court need not enter this thicket. The right to a trial before an impartial jury is at the heart of the protections afforded by the Constitution.[26] One who has been convicted by a tainted jury is confined in violation of the Constitution. This Court therefore aligns itself with those courts that have held that attacks on jury impartiality may be raised by habeas corpus. In consequence, the Court holds that Ida's challenge, as it concededly has been brought within the AEDPA period of limitation, is timely.

---

**20.** *See* Lucente Aff., May 17, 2001, ¶ 4 (referring to recordings of telephone conversations between Ruggiero and Lucente).

**21.** *See id.*

**22.** *E.g., United States v. Smith*, 62 F.3d 641, 650 n. 5 (4th Cir.1995).

**23.** *Zachary v. United States*, 275 F.2d 793, 796 (6th Cir.), *cert. denied*, 364 U.S. 816, 81 S.Ct. 46, 5 L.Ed.2d 47 (1960); *Rubenstein v. United States*, 227 F.2d 638, 642 (10th Cir.1955).

**24.** *E.g.*, 28 U.S.C. §§ 2244(d), 2255.

**25.** The current Rule 33 requires that a motion based on newly discovered evidence, the usual basis of attacks on jury impartiality, be made "within three years after the verdict or finding of guilty." The version in effect at the time of Ida's conviction provided that such a motion could be "made only before or within two years after final judgment."

**26.** *See, e.g., United States v. Schwarz*, Nos. 00–1479, 00–1483, 00–1515, 2002 WL 312501, at *14 (2d Cir. Feb.28, 2002).

## B. The Jury Tampering Argument

### 1. Procedural Default

Relying on the fact that Ida has been well aware since late in the trial that the government was investigating the possibility of jury tampering, yet failed to raise the question at trial, on direct appeal, or on his Rule 33 motion, the government contends that he has procedurally defaulted the issue and may not raise it now because he has failed to show cause for the default and prejudice or, alternatively, that he actually is innocent.[27] Ida disputes this conclusion. Because Ida's jury tampering argument relies both on evidence within and evidence outside the trial record, the analysis is somewhat complex.

 The trial record disclosed that the FBI may have been conducting an investigation into possible jury tampering and the Court's response to that information. To whatever extent Ida claims that the Court erred in failing to act otherwise than it did on the basis of that information, the matter could have been raised on direct appeal and is not available to Ida on a Section 2255 motion[28] except on the theory of ineffective assistance of counsel.[29] But the trial record contains no confirmation that there in fact was an investigation. More importantly, Ida relies also on the Lucille Ruggiero and Lucente affidavits and, although it avails him nothing in this connection, the Sullivan affidavit. In all the circumstances, this Court concludes that Ida's failure to raise the point on appeal did not default the issue.

### 2. Hearing

Ida tacitly acknowledges that his evidence does not warrant setting aside his conviction on the ground that the jury was tampered with. But he does claim that he is entitled to a hearing on the issue. He relies chiefly on United States v. Moten,[30] and particularly on its statement that "when reasonable grounds exist to believe that the jury may have been exposed to such an [outside] influence, 'the entire picture should be explored.'"[31]

 It is important at the outset to emphasize that there is not a shred of evidence that there was any contact with any member of this jury. While the government late in the trial had its suspicions and conducted an investigation, its investigation turned up nothing, and no charges ever were filed. Nor did the government's investigation itself taint the jury, as the record shows that it had no contact with any sitting juror prior to the return of the verdicts. Ida has done no better. Hence, he is forced to fall back on Lynch's alleged statement to Sullivan that Ruggiero, who was acquitted, owes him a favor and, conceivably, the government's unsubstantiated suspicion that Lucente knew one of the jurors. That simply is not enough, as careful examination of Moten reveals.

27. Govt. Supp. Mem. 9–10 (citing *Rosario v. United States*, 164 F.3d 729, 732 (2d Cir. 1998), *cert. denied*, 526 U.S. 1033, 119 S.Ct. 1284, 143 L.Ed.2d 376 (1999)).

28. *E.g., Douglas v. United States*, 13 F.3d 43, 46–47 (2d Cir.1993), *superseded by statute on different grounds as recognized in Triestman v. United States*, 124 F.3d 361, 369 n. 8 (2d Cir.1997).

29. *See, e.g., Billy–Eko v. United States*, 8 F.3d 111, 114–15 (2d Cir.1993), *superseded by stat-ute on different grounds as recognized in Triestman v. United States*, 124 F.3d 361, 369 n. 8 (2d Cir.1997).

30. 582 F.2d 654 (2d Cir.1978).

31. *Id.* at 660 (quoting *Remmer v. United States*, 350 U.S. 377, 379, 76 S.Ct. 425, 100 L.Ed. 435 (1956)). *Accord, United States v. Schwarz*, 283 F.3d 76, 2002 WL 312501, at * 19.

In *Moten,* a juror named Keno approached the sister of one of the defendants, one Intersimone, told her that he had a message for Intersimone, and insisted that Intersimone meet him for lunch. Intersimone's lawyer reported this to the trial judge and the AUSA. The judge then examined Intersimone's sister and Keno *in camera,* following which he discharged Keno and replaced him with an alternate. He later reported what had transpired to the defendants and their counsel, including the fact that Keno had denied that he had discussed the matter with any other juror. After consultation with counsel, he conducted an *in camera voir dire* of each juror. The trial then proceeded and resulted in the conviction of another defendant, Moten.

Thus, the "reasonable grounds" to which the *Moten* court referred included competent evidence of an improper contact between at least one juror and the defense camp. There is nothing of the sort in this case. There is no evidence of improper contact with any juror. Indeed, even if Sullivan's affidavit were read extremely charitably to Ida—i.e., as indicating that Lynch voted to acquit Ruggiero despite an alleged bias against Italians and in favor of the police—it would not establish reasonable grounds to believe that there was improper contact with the jury.[32] In consequence, there is no basis for a hearing on the claim of possible jury tampering.

### 3. Discovery

Ida's fallback position, particularly in his reply memorandum, is that he is entitled to discovery or some other inquiry to determine whether there was jury tampering or whether the government's investigation into jury tampering itself unduly influenced the jury. Specifically, he seeks to interview jurors and to obtain minutes of the grand jury investigation of possible jury tampering.[33] Once again, he bases the argument chiefly on *Moten.*[34]

Following his conviction, Moten sought discovery of the *in camera* examinations of Keno and Intersimone's sister, the grand jury materials relating to the government's investigation of the Keno affair, and permission to interview jurors for the principal purpose of determining whether Keno had spoken to any other juror. In the course of proceedings on that motion, two affidavits were submitted. In the first, Intersimone's lawyer stated that he had advised the AUSA during the trial that Intersimone's sister had told him that Keno had been accompanied by another juror, probably no. 2 or no. 8, when he approached her, although the other juror stood apart during the conversation between Keno and Intersimone's sister. The second affidavit was that of the jury foreperson, who stated that jurors 2 and 8 and Keno often had lunch together during the trial and had established a "rapport."[35] The district judge denied the motion in all respects.

---

**32.** It should be noted also, as both this Court and the Court of Appeals have made clear, that there was no inconsistency between the conviction of Ida for conspiring to murder DeSimone and the acquittal of Ruggiero of carrying out that murder in aid of racketeering. Tr., July 25, 1997, at 25–26; *Bellomo,* 176 F.3d at 595.

**33.** At the time of filing of his habeas petition, Ida did not know definitively if there was indeed a grand jury investigation. In response to an inquiry by the Court, Assistant United States Attorney Barbara Ward submitted an affidavit attesting that the FBI and United States Attorney's Office investigated possible jury tampering and indicated that testimony was taken before a grand jury in 1997 in conjunction with this investigation. *See* Ward Aff. ¶ 2–3.

**34.** 582 F.2d at 654.

**35.** *Id.* at 658–59.

On appeal, the Second Circuit dealt separately with each of the three types of discovery Moten sought. It concluded that he was entitled to the transcript of the *in camera* examination "unless the government can show a need for a prompt completion of an ongoing investigation," in which case the district court was free to delay disclosure.[36] It held that he was entitled to the grand jury testimony of Keno and Intersimone's sister, although it made this disclosure contingent upon certain further findings on remand. Finally, given the evidence of the possible involvement of jurors 2 and 8 in Keno's approach to Ms. Intersimone, the Circuit concluded that inquiry of the other jurors to determine whether they had been tainted by Keno was appropriate, although it limited the scope of the permissible inquiry in light of Rule 606(b) of the Federal Rules of Evidence and reaffirmed the trial judge's authority to control any such inquiry.[37]

To the extent that *Moten* dealt with the defendant's right to see the transcripts of the *in camera* examinations that were conducted during trial, it has no bearing here, as there were no such examinations. It is necessary, however, to consider its implications for Ida's requests for access to grand jury minutes and to interview jurors.

### a. Grand Jury Minutes

The *Moten* panel based its ruling granting the defendant limited access to grand jury minutes relating to the investigation of the Keno incident on its conclusion that "the grand jury investigation is no longer active."[38] "Moten's showing of need," it wrote, "is sufficient at least to override the generalized need for grand jury secrecy and to shift the burden to the government to specify which portions of the grand jury minutes, if any, must remain secret."[39] This aspect of *Moten*, however, no longer is sound law.

■ One year later, the Supreme Court held in *Douglas Oil Co. v. Petrol Stops Northwest*,[40] that litigants seeking access to grand jury materials must show a particularized need for such materials—i.e., that "the material they seek is needed to avoid a possible injustice in another judicial proceeding, that the need for disclosure is greater than the need for continued secrecy, and that their request is structured to cover only material so needed."[41] Even more important for present purposes, it held that "such a showing must be made even when the grand jury whose transcripts are sought has concluded its operations" because "the interests in grand jury secrecy, although reduced, are not eliminated merely because the grand jury has ended its activities."[42] In addition, it held that "the burden of demonstrating this balance rests upon the private party seeking disclosure."[43]

■ In light of *Douglas Oil*, Ida's reliance on *Moten* in support of his application for discovery of grand jury materials is undermined substantially. Contrary to the situation in *Moten*, the burden now is on Ida to show that he has made a limited request for access and that his need for the material outweighs the continued interest in grand jury secrecy, this notwithstanding that the grand jury inquiry concluded some time ago. And he has failed

---

**36.** *Id.* at 660–62, 667.

**37.** *Id.* at 664–66.

**38.** *Id.*

**39.** *Moten,* 582 F.2d at 664.

**40.** 441 U.S. 211, 99 S.Ct. 1667, 60 L.Ed.2d 156 (1979).

**41.** *Id.* at 222, 99 S.Ct. 1667.

**42.** *Id.*

**43.** *Id.*

to sustain that burden. As indicated above, there is no competent, admissible evidence of any improper contact with any juror. In the absence of some substantial reason to believe that such contact occurred, Ida's request for access to grand jury minutes is little more than a fishing expedition. When considered in light of the facts that this was an anonymous jury, that disclosure of the grand jury materials would compromise the anonymity of the jurors, and that the Court itself has reviewed the grant jury minutes *in camera*, Ida has not demonstrated that his need for the grand jury materials is greater than the need for continued secrecy.

### b. Juror Interviews

As *Moten* recognized, there is a strong reluctance to bring jurors in after they have reached a verdict to look for potential instances of bias or. misconduct.[44] "To overcome this reluctance and to authorize a post-verdict inquiry, there must be 'clear evidence,' 'strong evidence,' 'clear and incontrovertible evidence,' 'substantial if not wholly conclusive evidence' "[45] "that a specific, nonspeculative impropriety has occurred which could have prejudiced the trial of a defendant."[46] As noted, the evidence before the Court of Appeals in *Moten* met that standard. The existence of an improper contact between juror Keno and Ms. Intersimone was clear, and there was admissible evidence demonstrating reasonable grounds to suppose that the impropriety may have affected other jurors.

Very much the same was true in *United States v. Schwarz*,[47] the recently decided case arising out of the Abner Louima incident. Before the close of the government's case, Justin Volpe, one of the defendant police officers, pleaded guilty to assaulting Louima. He allocuted out of the jury's presence, and during the allocution stated under oath that he had committed the offense with another officer. The trial judge instructed the jury that Volpe had pleaded guilty, but the details of the plea were not introduced into evidence and neither side called him as a witness.[48] The theory of defense of Charles Schwarz, one of the other officers on trial, was that Volpe had acted alone. Schwarz was convicted of participating and conspiring with Volpe to participate in the assault.

Following his conviction, Schwarz moved for a new trial on the basis that, *inter alia*, the jury had been exposed to facts that were not in evidence. In support of his motion, Schwarz presented affidavits of jurors which stated that the affiants had learned during trial from another juror that Volpe had indicated during his plea that he committed the assault with another officer,[49] a fact certainly relevant to the charge pending against Schwarz. These affidavits "contained clear and specific allegations of inappropriate exposure to extrinsic information."[50]

**44.** *United States v. Schwarz*, 283 F.3d 76, 96–97; *United States v. Rosario*, 111 F.3d 293, 298 (2d Cir.), *cert. denied sub nom. Bottone v. United States*, 522 U.S. 923, 118 S.Ct. 319, 139 L.Ed.2d 246 (1997); *United States v. Moon*, 718 F.2d 1210, 1234 (2d Cir.1983), *cert. denied*, 466 U.S. 971, 104 S.Ct. 2344, 80 L.Ed.2d 818 (1984); *Moten*, 582 F.2d at 665.

**45.** *King v. United States*, 576 F.2d 432 (2d Cir.) (quoting *United States v. Dioguardi*, 492 F.2d 70, 78, 79, 80 (2d Cir.), *cert. denied*, 419 U.S. 873, 95 S.Ct. 134, 42 L.Ed.2d 112 (1974), *cert. denied sub nom. Ostrer v. United States*, 419 U.S. 829, 95 S.Ct. 49, 42 L.Ed.2d 53 (1974)), *cert. denied* 439 U.S. 850, 99 S.Ct. 155, 58 L.Ed.2d 154 (1978).

**46.** *Moon*, 718 F.2d at 1234.

**47.** 283 F.3d 76.

**48.** *Id.* at 88.

**49.** *Id.*

**50.** *Id.*

Here, on the other hand, there is no specific allegation or evidence of any improper jury contact. Indeed, the evidence in this case is reminiscent of that in *King v. United States*,[51] where, in support of his request to question jurors to determine whether they had been exposed to prejudicial publicity regarding a crime he committed during trial, the movant offered (a) a one-page typed document purporting to have been signed by a juror and a witness and sworn to before a notary public and (b) an unsigned proposed affidavit authenticated by defense counsel as "what the [witness] told counsel over the telephone."[52] The Circuit held that "the evidence ... falls far short of what would be required to justify an inquiry."[53] Indeed, *Moten* distinguished the evidence offered in *King* as "frail and ambiguous" and noted that "a convicted defendant should not be allowed to waste the time of a district judge or inconvenience jurors merely to conduct a fishing expedition" on the basis of such a showing.[54]

■ Ida's request to interview jurors is supported by evidence even weaker than that in *King*. Moreover, the fact that this was an anonymous jury is entitled to consideration in the balance. The purpose of an anonymous jury in this case was to prevent jury tampering, juror harassment and intimidation. To permit Ida to question jurors after the fact because the government conducted an investigation into possible jury tampering—without either bringing charges or having any contact with sitting jurors—would be to allow him to circumvent the anonymity safeguard on the basis of whimsy or speculation.

## C. Alleged Juror Misconduct

The thrust of Ida's position is that he was deprived of a fair trial because the John Lynch who allegedly spoke to Sullivan was Juror No. 3 (as noted, the Court so assumes for purposes of argument) and that he (1) misled the Court during *voir dire* by failing to disclose his belief that the defendants' arrest established their guilt and a bias against Italians, (2) lied to the Court when questioned about the windshield breaking incident, and (3) improperly discussed the case prior to the discharge of the jury.

### 1. Procedural Default

The facts concerning Lynch's alleged remarks to Sullivan were known to Ida even before he was sentenced, yet he never raised the alleged juror misconduct prior to this motion. As none of that evidence appeared in the trial record, however, it could not have been raised on direct appeal. In consequence, the arguable procedural default was Ida's failure to raise the issue earlier, as for example on his prior motion for a new trial.

If this were a second motion for a new trial, Ida's failure to raise the issue previously would be problematic. Those who seek such relief are obliged to act with reasonable diligence,[55] and Ida certainly has not done so. Nevertheless, as the Court has indicated above, the issue is properly raised by habeas corpus. The government has not suggested that it has been prejudiced by Ida's delay in raising the issue.[56] Accordingly, the Court is con-

---

**51.** 576 F.2d 432.

**52.** *Id.* at 438.

**53.** *Id.* at 438.

**54.** *Moten*, 582 F.2d at 666–67.

**55.** *See, e.g., Brach v. United States*, 542 F.2d 4, 8 (2d Cir.1976).

**56.** In consequence, Rule 9(a) of the Rules Governing Section 2255 Proceedings for the United States District Courts does not come into play.

strained to hold that the claim is properly before it.

## 2. The Merits

■ Juries are presumed impartial,[57] and courts "are always reluctant to 'haul jurors in after they have reached a verdict in order to probe for potential instances of bias, misconduct or extraneous influences.' "[58] Post-verdict hearings therefore "should be avoided whenever possible."[59] Moreover, the potential scope for post-verdict hearings cannot properly be assessed without regard to the fact that the examination of jurors even in those rare cases in which hearings are held is circumscribed strictly by Evidence Rule 606(b), which provides that:

> "Upon an inquiry into the validity of a verdict . . ., a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations *or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict . . . or concerning the juror's mental processes in connection therewith,* except that a juror may testify on the question whether . . . any outside influence was improperly brought to bear upon any juror. Nor may a juror's affidavit or evidence of any statement by the juror concerning a matter about which the juror would be precluded from testifying be received for these purposes."[60]

Additionally, where a defendant contends that the right to an impartial jury was denied by a juror's failure to disclose material information during *voir dire,* the matter is governed by *McDonough Power Equipment, Inc. v. Greenwood.*[61] The defendant "must first demonstrate that a juror failed to answer honestly a material question on *voir dire* and then further show that a correct response would have provided a valid basis for a challenge for cause."[62] Against this background, the Court turns first to the specific remarks attributed by Sullivan to Lynch.

### a. The Broken Windshield

■ As Juror No. 3 disclosed the fact that his windshield had been broken and, implicitly, his belief that this event might have been connected with his jury service, the crux of Ida's position must be that the juror lied when he stated that he was "confident" that he could judge the case "fairly and impartially." Sullivan's affidavit does not even approach the required showing. The juror's alleged statement to Sullivan—that he was not going to be scared—is entirely consistent with his statement to the Court that he was confident that he could be impartial. At the end of the day, everyone knew that the juror believed that there might be a connection between the incident and the trial, and everyone—Ida included—accepted the juror's statement that he nevertheless could be fair. There is no reason to think differently now.

Nor could a hearing shed any light on this episode. The Court has assumed *arguendo* that the juror made the statement attributed to him by Sullivan. Surely

---

**57.** *Lockhart v. McCree,* 476 U.S. 162, 184, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986); *United States v. Ianniello,* 866 F.2d 540, 542–43 (2d Cir.1989).

**58.** *Ianniello,* 866 F.2d at 543 (quoting *Moon,* 718 F.2d at 1234).

**59.** *Id.*

**60.** Fed.R.Evid. 606(b) (emphasis supplied).

**61.** 464 U.S. 548, 104 S.Ct. 845, 78 L.Ed.2d 663 (1984); *see also United States v. Shaoul,* 41 F.3d 811, 815 (2d Cir.1994); *United States v. Langford,* 990 F.2d 65, 68 (2d Cir.1993).

**62.** *McDonough,* 464 U.S. at 556, 104 S.Ct. 845. *Accord, Shaoul,* 41 F.3d at 815.

Ida's position would not be improved if a hearing were held and the juror denied making the statement. And it is impossible to see what the juror, if called, properly might say, given Rule 606(b), except whether he did or did not make that statement. The Rule explicitly forecloses inquiry into "the effect of anything upon that ... juror's mind or emotions as influencing the juror to asset to or dissent from the verdict ... or concerning [his] mental processes in connection therewith...." In consequence, Ida could fare no better with a hearing than with the Court's assumption that the statement was made. And that statement is insufficient to demonstrate that the juror spoke falsely when he said that he was confident that he could be fair.

### b. The "Italians" Comment

■ The next aspect of the alleged statement to Sullivan that bears scrutiny is the juror's statement that he would not let "these Italians" [63] scare him, a comment that Ida suggests evidences anti-Italian bias that the juror failed to reveal during *voir dire*. Ida has failed to sustain his burden under *McDonough*.

During *voir dire*, all prospective jurors were asked whether they thought it more likely that a person of Italian descent would commit the crimes charged,[64] whether they had any feelings about persons of Italian descent that would make them unable to evaluate charges against such persons fairly,[65] and whether the fact that the case involved charges of alleged organizations referred to as the Mafia or La Cosa Nostra would prevent them from rendering a fair and impartial verdict based only on the evidence and the Court's instruc-

tions.[66] No one who answered affirmatively was seated. Hence, the alleged juror remark to Sullivan did not come in a vacuum—if made by a juror in this case, it was a remark by a person who had sworn that the defendants' apparent Italian heritage would not affect his ability to render a fair and impartial verdict.

Although references to individuals by ethnic descriptors often are frowned upon, the fact is that they are not unusual in everyday life and do not necessarily reflect bias. Here, the statement, assuming it was made, was unaccompanied by anything suggesting animus or prejudice. Lynch's use of the term "Italians" in a statement to Sullivan in no way suggests that he failed to answer honestly a material question during *voir dire*. The Sullivan affidavit therefore is insufficient to raise a genuine issue requiring a hearing to determine whether the statement was made. Even if a hearing were held, it would be difficult to see just what the alleged juror might say consistent with Rule 606(b) beyond admitting or denying the making of the statement, the making of which is assumed for purpose of this motion. Certainly it would be inappropriate for him to be examined as to what role any views he might hold about persons of Italian descent might have had on the verdict. And the mere making of the statement, if that occurred, would be insufficient to justify a challenge for cause. The *McDonough* standard therefore has not been satisfied.

### c. Stares in the Courtroom

■ Similarly, Sullivan's contention that the alleged juror told him that the defendants' stares were not going to intim-

---

**63.** All of the defendants who went to trial in this case had Italian surnames.

**64.** Tr. 30 ln. 11–14, 108 ln. 7–9, 210 ln. 24–25, 211 ln. 1.

**65.** *Id.* 30 ln. 15–18, 108 ln. 10–13, 211 ln. 2–4.

**66.** *Id.* 28 ln. 1–10, 103 ln. 16–22, 201 ln 22–25, 202 ln 1–3.

idate him also is insufficient to satisfy the *McDonough* test. Jurors are not prohibited from forming impressions based on a defendant's demeanor during the course of a trial. The fact that they do so is not an indicator that they were not honest during *voir dire*, nor is it a basis for impeaching a verdict.

### d. Presumption of Innocence

At the start of *voir dire*, the jurors were told that the indictment was not evidence of guilt and that each defendant is presumed innocent and remains so unless and until the government proves guilt beyond a reasonable doubt.[67] They then were asked whether they had any hesitation or unwillingness to accept any of these rules.[68] Later in the *voir dire*, they were asked whether they thought law enforcement officers more or less likely to testify truthfully than other witnesses. Juror No. 3 indicated no such views.[69] The thrust of Ida's position again therefore is that Sullivan's affidavit suggests that the juror misled the Court during *voir dire*.

 In this instance, it is difficult to see how the alleged statement, if it was made, could be reconciled with truthful responses to the *voir dire* questions referred to above. If indeed Lynch believed that the defendants would not have been arrested if they were not guilty, he may have approached the case with a presumption of guilt, not a presumption of innocence. If so, his failure to disclose that view in response to the Court's question as to whether he could apply the presumption of innocence, willingly and without hesitation, arguably was a failure to answer honestly. And there is no serious doubt that an affirmative response to the Court's

question would have afforded a basis for a meritorious challenge for cause. Accordingly, in this one instance, the *McDonough* test is satisfied, assuming the facts to be as Sullivan claims.

The government nevertheless contends that no hearing or other inquiry is required because the fact that the jury acquitted Ruggiero of all and both Ida and Frustaci of some charges indicated that the jurors did not harbor a presumption of guilt. In this instance, however, that is not a satisfactory answer. If in fact a juror held the view that the defendants were presumed guilty and, in substance, had the burden of proving their innocence, the return of some not guilty verdicts does not establish the overall fairness of the trial. The possibility that the defendants would have been acquitted on other charges as well save for the concealment of such a juror's views during *voir dire* cannot be disregarded.

A hearing limited to this issue therefore is necessary.

### III. Conclusion

The Court will conduct an evidentiary hearing concerning the limited issue described above on April 30, 2002 at 10:00 a.m. There is to be no contact by either side with Juror No. 3 except during the hearing by means of questioning while he is on the witness stand should he be called as a witness. If either side wishes to have Juror No. 3 served with a subpoena, it should cause issuance of a subpoena[70] and cause it to be delivered to the U.S. Marshal, on or before April 15, 2002, for service. The Court hereby authorizes the Clerk to disclose the name and last known

---

67. Tr. 29 ln. 23–25, 30 ln. 1–7, 104 ln. 18–25, 105 ln. 1–3, 202 ln. 23–25, 203 ln. 1–7.

68. Tr. 31 ln. 19–21, 106 ln. 13–15, 204 ln. 13–13.

69. Tr. 119 ln. 22–25, 236 ln 14–17

70. Counsel requesting such a subpoena check with Ms. Reyes as to the courtroom at which to make the subpoena returnable.

address of Juror No. 3 to the Marshal, and only the Marshal, for that purpose. In the event the Marshal is requested to serve such a subpoena, he shall not disclose any identifying or locational information to anyone absent further order of this Court. Any return or other proof of service shall be filed under seal, although the Marshal is free to inform counsel of the fact of service of any such subpoena. Counsel shall notify one another and the Court, on or before April 25, 2002, of the identities of all persons whom they intend to call as witnesses at the hearing.

SO ORDERED.