James IDA, Movant,

v.

UNITED STATES of America, Respondent.

No. 00 Civ. 8544(LAK).

United States District Court, S.D. New York.

June 4, 2002.

Michael Rosen, New York City, Flora Edwards, Sewaren, NJ, for Movant.

Robert Buehler, Barbara Ward, Maria Barton, Assistant United States Attorneys, New York City, James B. Comey, United States Attorney, for United States.

## MEMORANDUM OPINION

KAPLAN, District Judge.

Movant, reputedly the former *consigliere* of the Genovese organized crime family, was convicted after a lengthy jury trial of racketeering conspiracy, racketeering, eight substantive crimes which were alleged also as acts of racketeering, and conspiracy to defraud the United States. Three of the acts of racketeering, two of which were alleged also as substantive counts, were murders or conspiracies to commit murder. On October 7, 1997, he was sentenced to a term of life imprisonment, five years of supervised release, a mandatory special assessment, and a $1 million forfeiture. On April 30, 1999, the Second Circuit substantially affirmed the convictions, reversing only racketeering act 2(a) and count nine, the DeSimone murder conspiracy.[1]

---

1. *United States v. Bellomo,* 176 F.3d 580 (2d Cir.), *cert. denied,* 528 U.S. 987, 120 S.Ct. 447, 145 L.Ed.2d 364 (1999).

On October 15, 1999, Ida moved for a new trial based on alleged newly discovered evidence. The Court denied the motion on December 14, 1999, and the Second Circuit affirmed on September 14, 2000.[2]

Ida has moved pursuant to 28 U.S.C. § 2255 to vacate his conviction and sentence as well as for discovery in support of the motion and for a hearing. Much of the application focuses on alleged newly-discovered evidence concerning the murder of Hickey Dilorenzo and the conspiracy to murder Dominic Tucci, the evidence concerning which is summarized in the Second Circuit's opinion and need not be repeated here.[3] Movant alleges also that the government violated its disclosure obligations under *Brady v. Maryland*[4] and *Giglio v. United States*;[5] that he was deprived of the effective assistance of counsel; that *Apprendi v. New Jersey*[6] requires reversal of the criminal forfeiture verdict; and that the testimony of two of the government's witnesses should have been excluded under *United States v. Singleton.*[7] Finally, he seeks to have the government's memorandum in opposition to his motion stricken on the ground that the Assistant United States Attorney who signed it is not a member of the New York Bar. As previously noted, however, the centerpiece of the motion consists of claims of jury tampering and juror misconduct. In a prior opinion, familiarity with which is assumed,[8] the Court rejected all of the claims of jury tampering and all but one of the claims of juror misconduct and ordered a hearing as to the remaining juror misconduct claim. The hearing now having been concluded, the entire remaining part of the motion is ripe for disposition.

## I. Alleged Jury Misconduct

### A. Alleged Concealment of Pro–Prosecution Bias by Juror No. 3

In *Ida v. United States*,[9] the Court rejected all of the claims of jury tampering and juror misconduct Ida had raised thus far save his contention that Juror No. 3, now known to have been one John Lynch,[10] improperly misled the Court during *voir dire* by failing to disclose his alleged belief that the defendants would not have been arrested and brought to trial unless they were guilty—in other words, that he approached the case not with acceptance of the presumption of innocence, but with a presumption of guilt. Ida's claim rested on the affidavit of one William Sullivan, formerly a proprietor and bar tender at a golf club at which Lynch's wife was employed, which claimed that Lynch told him during the trial that he was a juror in this case and, among other things, that the defendants would not have been arrested and brought to trial unless they were guilty.

The Court conducted an evidentiary hearing on this issue on April 30, 2002 during which Ida called both Sullivan and Lynch as witnesses. Sullivan's account

---

2. *United States v. Ida*, 225 F.3d 647, 225 F.3d 647 (2d Cir.2000).

3. *Bellomo*, 176 F.3d at 588–90.

4. 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

5. 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972).

6. 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000).

7. 144 F.3d 1343 (1998), *rev'd en banc*, 165 F.3d 1297 (10th Cir.1999).

8. *Ida v. United States*, 191 F.Supp.2d 426 (S.D.N.Y.2002).

9. *Id.*

10. The trial jury was anonymous.

largely followed that set forth in his affidavit.[11] Lynch flatly denied having made any of the statements attributed to him by Sullivan or, for that matter, having discussed the case with him during or after the trial.[12] Thus, the question whether Lynch misled the Court during the *voir dire* in the respect claimed by Ida comes down to a pure question of credibility.

The Court has considered carefully the respective accounts of these witnesses, the inherent probabilities of their accounts, and their demeanor on the witness stand. Without attempting to set forth all of the considerations that have entered into the Court's determination, a number of factors are worthy of mention.

To begin with, Sullivan's contention that Lynch discussed the matter with him at all is improbable. This was an organized crime case involving several murder charges. The jurors were aware that their identities were secret.[13] They were taken from the courthouse each day in vehicles arranged by the United States Marshal Service and dropped at remote locations to avoid their being followed and identified. The likelihood that Lynch would have revealed even the fact that he was a juror in this case, let alone made the statements attributed to him, therefore is low.

This improbability is compounded by Sullivan's account. According to Sullivan, Lynch simply came into the bar and volunteered the series of points set forth in

Sullivan's affidavit without Sullivan offering any comment at all,[14] yet failed to mention any of a host of details concerning the case and the extraordinary treatment of the jurors that would have been at the very top of the list of points that someone in Lynch's position almost surely would have mentioned. Thus, Sullivan testified that Lynch did not tell him anything about what was going on in the case, did not tell him it was a murder case, did not tell him that the jury was anonymous, did not mention the extraordinary means taken to preserve the jurors' anonymity, and did not tell him who the defendants were.[15] And there are other problems with Sullivan's story.

Sullivan's tale first came to light as a result of his reporting what Lynch allegedly told him to his brother-in-law, an attorney named Michael Negri, at a family function a couple of months after the trial ended.[16] Negri's affirmation makes clear that when he heard whatever precisely Sullivan told him, he quickly contacted Jeffrey Hoffman, Esq., Ida's trial counsel.[17] How, then, did Negri know to contact Hoffman? According to Sullivan, Lynch never told him who the defendants were.[18] This information appeared only in the newspaper article Sullivan claims to have seen at the end of the trial.[19] Yet the Court is asked to believe that Sullivan knew enough—from a brief look at a newspaper article—about who had been on trial and, for that matter, who Ida's lawyer was

11. Hearing Transcript, Apr. 30, 2002, 11–18 (hereinafter "Hearing Tr."). Indeed, as the government notes, Sullivan's recall of the alleged conversations was limited mostly to the statements contained in his affidavit. Gov't Letter, May 24, 2002, at 3–4.

12. *Id.* 69–74.

13. Trial Transcript, p. 13–14, 91–92, 186 (hereinafter "Trial Tr.").

14. Hearing Tr. 38.

15. *Id.* 39–41.

16. *Id.* 41.

17. *Id.* 42; Negri Aff. ¶ 3 (Ex. E to Ida's Supp. Mem., May 21, 2001).

18. Hearing Tr. 40, 44–45.

19. *Id.* 41.

to give that information to Negri long afterward.

To be sure, one must consider how Ida and the defense team learned of Lynch's identity if Sullivan's story is a fabrication. But the question admits of several possible answers. For one thing, it is conceivable that Lynch or his wife told Sullivan, or Sullivan deduced from Lynch's long jury service, that Lynch was serving on this case but that nothing more was said. Even more likely is the possibility that the fact of Lynch's service on this jury became known as a result of his having been recognized in the courthouse. For example, during course of the trial, two police officers employed by a municipality in the area in which Lynch lives were outside the courtroom in which the trial took place and recognized Lynch as a juror. Indeed, the Assistant United States Attorney who tried the case on behalf of the government brought that fact to the Court's attention during the trial, and Lynch then acknowledged that he had recognized one of the officers.[20] Thus, while the Court certainly does not suggest that the officers, who evidently had some affiliation with the prosecution in this case, informed Ida or others connected with him of the identity of this juror, it is far from unlikely that some perhaps inadvertent remark by one of them ultimately resulted in the defense identifying Lynch and learning of his location and of the fact that his wife worked at the same bar as did Sullivan. Thus, there were ample means by which the Ida team could have identified Lynch other than that which Sullivan advanced. Sullivan's story is improbable to begin with, and the fact that the defense found out Lynch's identity does not strongly corroborate it.

Ida argues that Sullivan nevertheless should be believed because some of the things he claims Lynch told him could have come only from Lynch, specifically, that Lynch's car had been vandalized at a train station, that Lynch took notes during the trial, and that Lynch discussed the trial with someone named John Walsh. But Ida overstates the evidence.

First, Lynch was not the only person from whom Sullivan could have learned the fact that Lynch's car was vandalized at a train station. Lynch made clear at the hearing that numerous people in his neighborhood knew of the damage his windshield sustained at the train station.[21] And certainly Lynch's wife could have mentioned the fact in casual conversation with any number of people at the bar where Sullivan worked. Even if Lynch himself told Sullivan about his windshield, discussing what occurred to Lynch's car is wholly different than discussing the case on which Lynch was a juror. He was perfectly free to tell people that his car windshield had been broken at a train station and could have done so without violating his juror oath.

Second, the fact that Sullivan referenced Lynch's trial notes in his affidavit and that Lynch admitted to taking notes in the trial does not make Sullivan's account of the alleged conversation any more probable. Many jurors take notes, especially in trials as long as this one. And the fact that the juror sitting in chair number three took notes during this particular trial was not a secret to anyone who was in the courtroom, including Ida and his defense team.[22]

**20.** Trial Tr. 750–56; Hearing Tr. 77–79, 81–84.

**21.** Hearing Tr. 76 ("It was a known fact that my car was, windshield was smashed.").

Lynch testified further that he reported the incident to the police. *Id.*

**22.** Ida takes special umbrage at the suggestion that Sullivan's statement that Lynch took notes might have been a product of informa-

Finally, there is no admissible evidence before the Court that corroborates Sullivan's assertions with regard to John Walsh.[23]

The conclusion that Sullivan did not testify accurately is confirmed by the Court's assessment of the demeanor and credibility of the witnesses. The Court found Lynch direct, straightforward and candid.[24] It was not similarly impressed with Sullivan.[25] Considering all of these factors, as well as others that need not be enumerated here, the Court finds that Lynch never discussed the case with Sullivan or anyone else and never made any of the statements attributed to him by Sullivan.[26] Ida's juror misconduct argument, to the extent it survived the Court's prior decision, is entirely without merit.

## B. Belated Claims of Juror Misconduct

Although this Section 2255 motion has been pending for well over a year and was briefed extensively prior to the juror misconduct hearing, Ida sought at the hearing to raise entirely new claims of misconduct by Lynch, claiming that Lynch misled the Court by (a) failing to acknowledge that he knew two police officers whose names appeared on a list of possible government witnesses, (b) claiming, in an effort to avoid jury service on the ground of hardship, that he was the sole provider for his wife and children when in fact his wife was employed at the bar that Sullivan ran, (c) failing to disclose his predisposition in favor of law enforcement officers implicit in the alleged statement to Sullivan, (d) and ignoring the Court's instructions to leave any notes taken during the trial in the jury room.[27]

When Ida first sought during the hearing to raise these points, the Court ruled that it would not consider them in view of Ida's failure to raise them earlier.[28] The Court, however, did allow inquiry into these areas because they bore on Lynch's credibility and then allowed Ida the opportunity to brief the question whether the initial ruling should be adhered to. Ida declined this opportunity and briefed these

tion from Ida's team rather than Lynch. Ida Mem., June 3, 2002, at 5. That is hardly unlikely, particularly in view of the fact that Sullivan's initial handwritten statement was actually written by Ida's investigator. Hearing Tr. 27.

23. Ida listed Walsh on his witness list but elected not to call him as a witness at the hearing.

24. Ida's belated attacks on Lynch's credibility, and the Court's reasons for rejecting them, are dealt with in the next section.

25. The government suggested during its cross examination of Sullivan that Sullivan's father-in-law, as well some of the alleged guests at his wedding, had ties to organized crime and that members and associates of the Genovese family frequented Sullivan's bar. Hearing Tr. 30–32. This has played no role in the Court's assessment of Sullivan's credibility. As far as the Court is concerned, there is no evidence on the subject. In consequence, the Court

does not rely on the insinuation. Conversely, the degree of precision with which Sullivan was able to recall statements recorded in his affidavit, and his inability to recall virtually anything else about the alleged conversations, especially when combined with his discussions with lawyers and investigators from Ida's team prior to his testimony, did play a role in the Court's assessment of his credibility. Furthermore, Sullivan's account is internally inconsistent. For example, Sullivan testified that Lynch told him that defendant Ruggerio owed him a favor, Hearing Tr. 17, 43, but he testified also that Lynch never told him the identities of the defendants. Hearing Tr. 44.

26. The Court has considered, and rejects, all of the contrary arguments in Ida's June 3, 2002 and earlier submissions.

27. Trial Tr. 13.

28. Hearing Tr. 67.

claims solely as they related to Lynch's credibility.[29] Having considered the matter further, the Court adheres to its view that Ida's failure to raise these issues in a more timely fashion precludes him from doing so now.

Had Ida pressed these claims as additional grounds for relief as distinct from matters bearing on credibility, he in substance would be seeking to amend his Section 2255 motion to conform to the evidence. Such a motion would be governed by Rule 15 of the Federal Rules of Civil Procedure.[30] In consequence, Ida would be required to demonstrate that the new claims satisfied Rule 15's relation back requirements.[31] He has made no such showing. But the point ultimately would be academic even if Ida had pressed it. Based on the evidence presented at the hearing, there is no merit to any of these claims.

First, the Court credits Lynch's testimony that he overlooked the names of the two police officers in scanning the nine page, single spaced list of prospective government witnesses.[32] It therefore finds that he did not wittingly mislead the Court in this respect during *voir dire*.

Similarly, the Court finds, that Lynch in fact did not hold the view of law enforcement officers attributed to him by Sullivan and did not disregard the Court's instructions with respect to his notes of the trial.[33]

■ The final claim—that Lynch misled the Court by claiming that he was the sole supporter of his family—requires slightly more discussion, but leads to no different result. To be sure, Lynch's contention that he was the *sole* supporter was not literally true, as his wife worked seven hours per week at Sullivan's bar.[34] But it was not far from the truth. And this modest exaggeration warrants no relief here.

■ In order to set aside a jury verdict on the ground that a juror misled the Court during *voir dire*, Ida "must first demonstrate that [the] juror failed to answer honestly a material question on *voir dire* and then further show that a correct response would have provided a valid basis for a challenge for cause."[35] A literally truthful statement—that Lynch supported his family with aid from his wife's seven-hour per week job—would not have

---

**29.** *See* Post–Hearing Mem. (*passim* ).

**30.** *See, e.g., Littlejohn v. Artuz,* 271 F.3d 360, 364 (2d Cir.2001); Rule 12, Rules Governing Section 2255 Proceedings (Federal Rules of Civil and Criminal Procedure, as appropriate, govern § 2255 motions in respects not covered by § 2255 Rules); FED. R. CIV. P. 15.

**31.** *See Fama v. Comm'r of Corr. Servs.,* 235 F.3d 804, 815–16 (2d Cir.2000).

**32.** Hearing Tr. 68. Ida attempts to make something out of the fact that it was an AUSA, as opposed to Lynch, who brought to the Court's attention the fact that Lynch waved to one of these police officers in the hallway outside of the courtroom. As far as Lynch knew, the officer he recognized in the hallway had no involvement in the case on which Lynch was a juror. The officer had not testified and was not recognized in the courtroom.

The incident took place near the elevators outside of the courtroom on a floor on which there are three other courtrooms. Absent a reason to know that the man he saw was involved in the case, there simply was no reason for Lynch to inform the Court of the wave. His failure to do so does not impeach his credibility.

**33.** *See id.* 73–74.

**34.** Hearing Tr. 10.

**35.** *McDonough Power Equip., Inc. v. Greenwood,* 464 U.S. 548, 556, 104 S.Ct. 845, 78 L.Ed.2d 663 (1984); *see also United States v. Shaoul,* 41 F.3d 811, 815 (2d Cir.1994); *United States v. Langford,* 990 F.2d 65, 68 (2d Cir.1993).

grounded a meritorious challenge for cause.[36]

In view of the foregoing, the Court rejects all of Ida's claims of juror misconduct both on the merits and, in the case of these eleventh hour contentions, on the ground of their untimeliness.

## II. Alleged Newly Discovered Evidence

■ Although our Court of Appeals on occasion has passed on newly discovered evidence claims under Section 2255,[37] it is not clear that any availability of Section 2255 as a vehicle for such contentions survives *Herrera v. Collins* absent an independent constitutional violation.[38] Inasmuch as a motion by Ida for a new trial pursuant to FED. R. CRIM. P. 33 would have been timely when this motion was filed and the standards are the same,[39] however, there is no need to decide that point in this case. The Court treats the newly discovered evidence claim under Rule 33.[40]

■ New trial motions "are not favored and should be granted only with great caution."[41] Where, as here, such a motion is premised on a claim of newly discovered evidence, the movant must show that the evidence in fact has been newly discovered, that it could not have been discovered earlier with due diligence, that it is material to the issue of guilt, that it is not cumulative, and that the evidence probably would result in acquittal upon retrial.[42]

### A. Statements of Mastrototaro, Cuomo and Schenone

■ The core of the alleged newly discovered evidence consists of statements of (1) Carlo Mastrototaro, which controverts certain testimony of Alphonse D'Arco relevant to the Dilorenzo murder conspiracy,[43] (2) Ida's co-defendant, John Schenone, who contends that Ida was not involved in a conspiracy to murder Dominic Tucci or with Schenone's interstate transportation of stolen construction equipment,[44] and (3) attorney Scott Leemon, who claims that his former client, Ralph Cuomo, now would controvert certain testimony of D'Arco relating to the Dilorenzo conspiracy.[45] This material, either singly or in combination, does not warrant a new trial.

To begin with, there has been no showing that the information was unknown to or undiscoverable by Ida with due diligence at the time of trial. He knew of all

---

**36.** Such challenges generally are grounded in actual, implied, or inferable bias, *see United States v. Torres*, 128 F.3d 38, 43 (2d Cir.1997), and Lynch's failure to mention his wife's employment does not reflect any of these biases.

**37.** *E.g., Giacalone v. United States*, 739 F.2d 40, 43 (2d Cir.1984) (requiring newly discovered evidence before allowing relitigation on habeas of a claim that previously was decided on direct appeal).

**38.** 506 U.S. 390, 400–04, 113 S.Ct. 853, 122 L.Ed.2d 203 (1993) (newly discovered evidence of actual innocence not basis for habeas relief in favor of state prisoner). *See Guinan v. United States* 6 F.3d 468, 470–71 (7th Cir.1993) (not basis for relief under § 2255); *United States v. DeCarlo*, 848 F.Supp. 354, 356–57 (E.D.N.Y.1994) (same).

**39.** *Giacalone v. United States*, 739 F.2d at 43.

**40.** *See United States v. Kearney*, 682 F.2d 214, 218 (D.C.Cir.1982); *Pelegrina v. United States*, 601 F.2d 18, 19 & n. 2 (1st Cir.1979).

**41.** *United States v. Costello*, 255 F.2d 876, 879 (2d Cir.).

**42.** *See generally United States v. Gallego*, 191 F.3d 156, 161 (2d Cir.1999), *cert. denied*, 530 U.S. 1216, 120 S.Ct. 2220, 147 L.Ed.2d 252 (2000); *Sanders v. Sullivan*, 863 F.2d 218, 225 (2d Cir.1988).

**43.** Pet. Ex. N.

**44.** *Id.* Ex. W.

**45.** *Id.* Ex. P.

three men as a result of personal relationships, the government's 3500 material, and/or D'Arco's testimony. And while all three now contend or imply that they would have invoked the Fifth Amendment if called at Ida's trial in consequence of their own then-unresolved criminal cases, the fact remains that there is no suggestion that Ida made any effort to procure their testimony. He did not seek, for example, to have his co-defendant, Schenone, whose case had been severed, tried first in order to permit Schenone to testify at Ida's trial. And it is not hard to understand why no such effort was made.

The case against Ida depended in part on the testimony of D'Arco and, to a considerably lesser degree, Carmine Sessa, mob figures with long records of murders and other crimes. Ida's trial strategy, as his counsel's opening and summation made clear,[46] was to attempt to discredit them as career criminals whose word was not to be trusted. Mastrototaro, Cuomo and Schenone, however, were of the same stripe. Witnesses called by Ida testified that Cuomo was observed with D'Arco, allegedly dealing in narcotics.[47] Mastrototaro and Cuomo were identified by D'Arco as members of the Genovese and Lucchese families, respectively.[48] Both have multiple felony convictions. The evidence at trial showed also that Schenone was a convicted felon, that agents who arrested Schenone found him in possession of a virtual arsenal, that he attempted to suborn a witness, and that he was involved intimately in Ida's criminal activities.[49] Calling any of them would have undermined Ida's strategy by putting him in bed, figuratively speaking, with the same sort of criminals whom he was trying to discredit.

Rule 33 does not permit a defendant to make a tactical trial decision not to call certain witnesses and then to seek a new trial later if the tactic does not result in an acquittal.[50] That is precisely what Ida is doing here. But it is unnecessary to rely on this point alone for the simple reason that this sort of testimony—testimony known or knowable but unavailable at the time of trial for legal reasons—does not qualify as newly-discovered evidence for purposes of seeking a new trial.[51] As the Fifth Circuit aptly put it, " '[n]ewly available' evidence is [not] synonymous with 'newly discovered' evidence." [52]

Even if one were to put aside these difficulties, this evidence still would provide no basis for a new trial, as it would merely be impeaching, cumulative, and of little probative value. Mastrototaro and Cuomo are offered to further impeach D'Arco and to do so on comparatively collateral points. Both have multiple felony convictions and links to organized crime. The points on which they would contradict D'Arco relate to events that occurred years ago and involved matters that were

46. Trial Tr. 41–42, 4844–85.

47. *Id.* 4465, 4473.

48. *Id.* 2439.

49. *E.g., id.* 3528–33, 3542–45, 3551–54, 3567–74, 4041–44; GX 508–16.

50. *See United States v. Turns,* 198 F.3d 584, 587–88 (6th Cir.2000); *United States v. Natelli,* 553 F.2d 5, 7–8 (2d Cir.1977).

51. *See United States v. Jacobs,* 475 F.2d 270, 286 & n. 33 (2d Cir.1973) (sustaining trial court refusal to consider as "newly discovered" evidence that existed all along and that was unavailable only because co-defendant, since convicted, invoked privilege against self incrimination); *see also United States v. Theodosopoulos,* 48 F.3d 1438, 1448–49 (7th Cir.) (same); *United States v. Muldrow,* 19 F.3d 1332, 1339 (10th Cir.) (same).

52. *United States v. Metz,* 652 F.2d 478, 480 (5th Cir.1981).

of no particular note at the time (e.g., whether Cuomo ever saw Ida in a restaurant with D'Arco and Dilorenzo) and thus easily might have been forgotten. And D'Arco's credibility was vigorously and capably attacked at trial on issues including his extensive and violent criminal history.[53] Similarly, Schenone's proposed testimony would go largely to impeaching the trial testimony of Richard Sprague, who was challenged on cross concerning discrepancies between his testimony and FBI debriefing reports.[54]

Finally, the proposed testimony of these three witnesses does not come remotely close to satisfying Ida's burden of demonstrating that he probably would have been acquitted had they testified, essentially for the reasons set forth in the government's memorandum.[55] As already alluded to, neither Mastrototaro, Schenone, or Cuomo would have enjoyed much credibility with the jury.[56] Most important, none of the evidence Ida seeks to present alters either the most compelling evidence connecting Ida to the Dilorenzo murder—the collect telephone calls to Ida's house after the murder—or the taped conversations, video surveillances, and the proposed murder weapon that corroborated Sprague's testimony. In light of this, Ida has not shown that he probably would have been acquitted had this evidence been presented at trial.

**B. Proceeds of Sale of Katonah Property**

Ida's claim with respect to the sale proceeds is frivolous and irresponsible.[57] The government properly executed the forfeiture verdict and allowed the title holder, Hickey, to list and sell the property. The jury knew that Hickey was the title holder at the time it rendered its verdict but accepted the government's argument that Ida was the true owner. Ida had the opportunity to refute the government's claims of unexplained wealth at trial, and the jury found against him. To be sure, the jury did not know the amount for which the property was sold, for the very good reason that the sale occurred almost two years after Ida was convicted, but the eventual sale price of the property has no bearing on the jury's forfeiture verdict. And the fact that, almost two years after the verdict, Hickey retained the proceeds from the sale of the house rather than transferring them to Ida does nothing to undermine that verdict. In any case, Ida has not met his burden of showing he probably would have been acquitted had the jury known that Hickey would retain the proceeds from the sale.[58]

**III. Alleged Brady and Giglio Violations**

**A. Material Relating to D'Arco**

Ida was convicted at trial of conspiring to murder Ralph DeSimone. The

---

53. Trial Tr. 2558 et seq.

54. *Id.* 3445 et seq.

55. Resp. Mem. 24–27.

56. Mastrototaro has three felony convictions and Cuomo has four. Evidence presented at the trial showed that Schenone acted as an associate of Idas. Mastrototaro and Cuomo each previously has been charged with being a capo in the Genovese family's Massachusetts operations, and Schenone previously admitted that he solicited Sprague's murder

after Sprague began cooperating with the government, which corroborates Sprague's trial testimony. *See id.*

57. *See id.* 27–29.

58. To the extent that Ida's claim on this point can be read as seeking assistance in recovering those proceeds from Hickey, this petition is an inappropriate vehicle for such relief. Of course, it is doubtful that such relief is available, given the illegality of the contract between Hickey and Ida. *See* Resp. Mem. at 24–27.

government's theory, which rested on testimony by D'Arco, was that members of the Lucchese family told the leadership of the Genovese family, including Ida, that DeSimone had testified, presumably in favor of the government and in violation of the "rules" of organized crime, in another case, that Ida and the other Genovese family members present indicated that "they will take care of it" as one of them made a gesture suggesting that they would have DeSimone shot in the head, and that the bullet-ridden body of one Ralph DeSimone was found in the trunk of his own car at LaGuardia Airport five months later. The government asserted, moreover, that the killing was done by Louis Ruggiero Senior in order to maintain or improve his position with the Genovese family, although the jury acquitted Ruggiero.

Although Ida's conviction for the DeSimone murder conspiracy was overturned by the Court of Appeals, he now claims that the government withheld evidence, an FBI Form–302, which showed that Ruggiero was not connected with the Genovese family and that this evidence could have been used to attack D'Arco's credibility.[59] The form in question, which is dated June 1, 1995, relates an interview with an unidentified cooperating witness and states in relevant part that "RUSSO also owns an apartment in Fort Lee, New Jersey. LOUIE RUGGIERO lives in this apartment. RUGGIERO did some 'work' (murder) for 'Curly' RUSSO and ANTHONY

BARATTA and CW advised that is the reason why RUGGIERO is being 'taken care of' by the RUSSOS." [60]

To begin with, Ida's reading of the 302 is unduly aggressive, to say the least. The 302 does not indicate that the Louie Ruggiero there referred to is the same Louis Ruggiero who was Ida's co-defendant in this case and whom the government accused of murdering DeSimone.[61] Even if it did refer to the same Ruggiero, evidence that Ruggiero committed a murder for the Lucchese family does not even begin to exclude the possibility that he committed a murder for the Genovese family as well. Finally, it is impossible to see how any of this would have affected D'Arco's credibility. D'Arco, after all, never said anything about Ruggiero. He testified only that Ida was party to an agreement to "take care of"—i.e., kill—DeSimone. The government's proof that DeSimone was murdered and that Ruggiero Senior was the killer was entirely independent of D'Arco. In these circumstances, Ida's claim of a *Brady–Giglio* violation is frivolous.

 In order to establish a *Brady* violation, the defendant must show that (1) the government suppressed favorable evidence, and (2) the evidence the government suppressed was material.[62] "[F]avorable evidence is material, and constitutional error results from its suppression by the government, if there is a reasonable probability that, had the evidence

---

59. He claims also that the government "withheld" an argument it had made in the so-called "Cowboy Trial," *United States v. Ruggiero, Jr.*, S92 Cr. 811(KC). Obviously, the government cannot be charged with "withholding" evidence that it made a particular argument in a public criminal trial that was concluded long before this case was tried. *See, e.g., United States v. Passero*, 290 F.2d 238, 244 (2d Cir.1961).

60. Pet. Ex. GG.

61. The Louis Ruggerio who was a defendant in this case resided in an apartment house in Englewood Cliffs, New Jersey, at the time of the murder. *See* Trial Tr. 3144–47, 3273, 3275, 3300. The Ruggerio mentioned in the 1995 302 lived in Fort Lee. While they may be the same individual, there is no such evidence.

62. *United States v. Payne*, 63 F.3d 1200, 1208 (2d Cir.1995).

been disclosed to the defense, the result of the proceeding would have been different." [63] "A reasonable probability is a probability sufficient to undermine confidence in the outcome of the case." [64]

For the reasons already set forth, Ida has failed to establish that the 302 was favorable evidence. In any case, it certainly is not material, as the evidence would not have affected D'Arco's credibility, particularly in light of the vigorous and well grounded assault mounted against him at trial by Ida's counsel.

### B. Material Relating to Sessa

██ Ida's argument concerning the suppression of evidence relating to Carmine Sessa is less of the same. Sessa gave a good deal of background evidence concerning organized crime including, *inter alia*, his own activities in the period 1987–1992. He testified that he became a cooperating witness in 1993. But Ida theorizes that perhaps he became a cooperating witness earlier, a theory supported only by the facts that he was sentenced to probation for conspiracy to commit bank robbery and then again for violating his probation in the 1980's. Assuming the truth of that supposition, he asserts that the government must have suppressed evidence of Sessa's earlier cooperation, which could have been used either to preclude Sessa from testifying or to attack his credibility.

██ With all due respect, this is not even a respectable argument. A defendant cannot satisfy the suppression requirement if the defendant "either knew, or should have known, of the essential facts permitting him to take advantage of [the allegedly suppressed] evidence." [65] Sessa's sentences in the 1980's were matters of public record, so Ida was fully able to argue to the jury whatever inferences he believes should have been drawn from them; surely the government cannot properly be charged with having suppressed that evidence. Nor has he come forward with any evidence, much less admissible evidence, that Sessa in fact became a cooperating witness earlier than 1993. There is no merit at all to his contention, and he is not entitled to a hearing on it under *Aiello*. [66]

### IV. Ineffective Assistance of Counsel

Ida claims that his trial counsel rendered ineffective assistance by failing adequately to prepare for trial, failing to demand a *Remmer* hearing with respect to the possible jury tampering discussed in the Court's prior opinion, failing to offer evidence that Ida was not living on Staten Island at the time of the DiLorenzo murder, failing to object to the jury charges on reasonable doubt and aiding and abetting, and failing to object to an alleged impermissible amendment of the indictment.

██ In order to demonstrate ineffective assistance of counsel, Ida must show that "counsel's performance was so defective that 'counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment' ... and that counsel's errors were 'so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.'" [67] To satisfy the

**63.** *United States v. Avellino,* 136 F.3d 249, 256 (2d Cir.1998).

**64.** *Payne,* 63 F.3d at 1209 (internal quotations omitted).

**65.** *United States v. LeRoy,* 687 F.2d 610, 618 (2d Cir.1982).

**66.** *United States v. Aiello,* 814 F.2d 109, 113–14 (2d Cir.1987).

**67.** *Brown v. Artuz,* 124 F.3d 73, 79 (2d Cir. 1997) (quoting *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)).

first prong movant is required to show that counsel's performance was "outside the wide range of professionally competent assistance." [68] To satisfy the second, movant must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." [69] This standard is not satisfied with respect to any of Ida's claims.

## A. Inadequate Preparation

■ The trial of this action began on February 4, 1997. Several of Ida's co-defendants pleaded guilty during jury selection. So the Court dismissed the panel and adjourned for three weeks to permit defense counsel to regroup. Jury selection then began anew on February 24, 1997, and the case was tried to verdict.

Ida makes a conclusory allegation that his counsel's effectiveness was impaired because he had counted on the efforts of counsel for the co-defendants who pleaded guilty during jury selection and then had only three weeks in which to prepare prior to the start of the trial at which Ida was convicted. He claims also that trial counsel's performance was affected for the worse by a motion for a new trial made by a former client in December 1996 on the ground of ineffective assistance of counsel.

These contentions are baseless. Ida's counsel had from the date of Ida's arrest on June 11, 1996 until the start of jury selection on February 4, 1997 in which to prepare. After five of Ida's co-defendants pleaded guilty during jury selection, he had an additional three weeks. There is not a shred of evidence that he was not

fully prepared to try the case, much less that better preparation would have yielded a different result. Nor is there any evidence to suggest that any concern that counsel may have had regarding the new trial motion made by his former client affected his performance in the slightest or that Ida was prejudiced.

## B. Failure to Demand a Remmer Hearing

■ Ida next argues that his counsel fell below the constitutionally minimum floor of competence by failing to demand a hearing under Remmer v. United States [70] when Ruggiero's counsel announced near the end of the trial that Ruggiero's daughter had been subpoenaed regarding jury tampering, an incident discussed in the Court's earlier opinion.[71] In determining whether counsel's performance was deficient, it is necessary first to consider the merits of Ida's claim.

Remmer dealt with a situation in which a juror met ex parte with the trial judge and advised him that the juror had been approached by a third party with an offer of a bribe in exchange for a favorable verdict. The judge interviewed the juror ex parte and determined that the juror was unbiased without informing the parties of what had occurred. The Supreme Court began its discussion by saying that "any private communication, contact, or tampering . . . with a juror during a trial . . . is . . . deemed presumptively prejudicial" although it added that the presumption is rebuttable.[72] It went on to reverse the conviction, holding that the trial court

---

**68.** Strickland, 466 U.S. at 690, 104 S.Ct. 2052. Accord, e.g., Hurel Guerrero v. United States, 186 F.3d 275, 281 (2d Cir.1999).

**69.** Strickland, 466 U.S. at 694, 104 S.Ct. 2052.

**70.** 347 U.S. 227, 74 S.Ct. 450, 98 L.Ed. 654 (1954).

**71.** Ida, 191 F.Supp.2d at 428–29.

**72.** 347 U.S. at 229, 74 S.Ct. 450.

should not have taken final action *ex parte*, but should have "determine[d] the circumstances, the impact thereof upon the juror, and whether or not it was prejudicial in a hearing with all interested parties permitted to participate." [73] Thus, the case dealt with whether "concededly existing and admissible evidence" of improper jury contact was sufficient to warrant a hearing concerning jury tampering. [74]

Even assuming that *Remmer's* presumption has survived subsequent Supreme Court decisions and that it applies in the Section 2255 context, each a matter of considerable doubt, [75] it would have no bearing in this case. Here, Ruggiero's counsel announced in open court only that his client's daughter had been subpoenaed in an inquiry relating to jury tampering. There was no competent evidence of any improper contact with the jury. Hence, even if counsel had demanded a hearing, he would have been unlikely to obtain it. [76] And there is no basis at all to suppose that a hearing would have revealed evidence of improper contact that had prejudiced one

or more jurors. Indeed, even now there is no such evidence. Accordingly, counsel's failure to demand a hearing did not depart from the minimum acceptable level of representation. In any case, there was no prejudice.

The cases upon which Ida relies do not support his position. Indeed, they point up its weakness.

Ida points principally to *United States v. Ianniello*, a case in which the Court of Appeals remanded for an inquiry into allegations of jury tampering. But it did so only in the face of "affidavits of three jurors alleging specific acts of inappropriate conduct ... that constitute competent and relevant evidence." [77] And it emphasized that such hearings are warranted only where there is "strong, substantial and incontrovertible evidence" of improper jury contacts. [78] Here there is no evidence of improper contact at all.

He relies also on an unpublished Fourth Circuit opinion, *Daniel v. West Virginia*, [79]

**73.** *Id.* at 229–30, 74 S.Ct. 450.

**74.** *Hayden v. United States*, 637 F.Supp. 1202, 1204 (S.D.N.Y.1986).

**75.** Several circuits have held that *Smith v. Phillips*, 455 U.S. 209, 216–17, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982), and *United States v. Olano*, 507 U.S. 725, 739, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993), reinterpreted *Remmer* to shift the burden of demonstrating prejudice to the defendant or abandoned it altogether in certain circumstances. *E.g., United States v. Sylvester*, 143 F.3d 923, 933–34 (5th Cir. 1998); *United States v. Williams–Davis*, 90 F.3d 490, 496–97 (D.C.Cir.1996); *United States v. Walker*, 1 F.3d 423, 431 (6th Cir. 1993); *United States v. Boylan*, 898 F.2d 230, 261 (1st Cir.); *but see United States v. Dutkel*, 192 F.3d 893, 896 (9th Cir.1999). In any case, it is questionable whether *Remmer's* presumption of prejudice—triggered by the presence of credible, substantial evidence of improper communication—applies to a Section 2255 motion on which the defendant has the

burden of proving the invalidity of the conviction. *See Polizzi v. United States*, 926 F.2d 1311, 1321 (2d Cir.1991); *see also Pinkney v. Keane*, 920 F.2d 1090, 1094 (2d Cir.1990) (reaching same conclusion regarding burden of proof on Section 2254 motion).

**76.** *United States v. Ianniello*, 866 F.2d 540, 543 (2d Cir.1989) (post-trial jury hearing held only when party comes forward with "clear, strong, substantial and incontrovertible evidence ... that a specific, non-speculative impropriety has occurred") (citing *United States v. Moon*, 718 F.2d 1210, 1234 (2d Cir.1983); *King v. United States*, 576 F.2d 432, 438 (2d Cir.1978)).

**77.** *Id.*

**78.** *Id.* (quoting *Remmer*, 347 U.S. at 229–30, 74 S.Ct. 450).

**79.** No. 97–6806, 1999 WL 713865 (4th Cir. Sept.14, 1999) (reported in table form, 191 F.3d 447, 1999 WL 713865).

for the proposition that the failure to demand a *Remmer* hearing falls below an objective standard of reasonable representation. But he ignores both the facts and the outcome of the case. As far as facts are concerned, the defendant's counsel learned during trial that a defense witness twice called one of the juror's and offered the juror's son a deal on a used car if she would help the defendant.[80] Thus, blatantly improper contacts had occurred, but counsel acquiesced in the trial court's proceeding with the trial after an *ex parte* interview with the juror—almost exactly what had occurred in *Remmer*. While the Fourth Circuit agreed that counsel's representation in this respect was inadequate, that conclusion has no bearing here because counsel here was not aware of any improper contacts with the jury. Moreover, the Fourth Circuit in *Daniel* went on to deny the defendant's habeas petition, in this respect on the ground that he failed to show actual prejudice as required in ineffective assistance claims by *Strickland*. Hence, even if Ida's counsel was ineffective in failing to demand a *Remmer* hearing, which he was not, Ida nevertheless would lose on this ground for precisely the same reason as the defendant in *Daniel*—failure to prove prejudice.

## C. Failure to Offer Evidence of Ida's Residence

A key part of the evidence against Ida with respect to the Dilorenzo murder was the placement of several telephone calls from phones located near the New Jersey murder scene to Ida's residence on Staten Island—calls that the government con-

tended showed that the shooter was trying to reach Ida to report on the killing or, perhaps, to seek assistance in view of the fact that the apparent getaway car had been scared off and evidently left the shooter stranded at the scene of the crime. Although the government proved at trial that Ida was the subscriber to the telephone number on Staten Island, Ida now contends that he was separated from his wife and not living at the Staten Island location at the time of these events and that counsel was ineffective for failing to adduce evidence of that fact.

 Trial counsel are presumed competent.[81] Their judgments with respect to presenting or not presenting evidence will not be faulted if there is any plausible basis for them.[82] And here the plausible bases for declining to present such evidence abound.

 To begin with, Ida's counsel cross-examined the government's witnesses to show, among other things, that there was no evidence as to who made the critical telephone calls, who was at home when they were received, and that the telephone records offered by the government were incomplete and thus failed to show whether other calls had been made to the Ida residence from the same town in New Jersey on other occasions.[83] Thus, Ida laid the basis for his argument that there was no evidence to justify the conclusion that the calls were made by the shooter and no evidence to support the view that they were made to Ida. Further, there is no reason to suppose that anyone but Ida,

---

80. 1999 WL 713865, at *3.

81. *Strickland*, 466 U.S. at 690, 104 S.Ct. 2052; *Clark v. Stinson*, 214 F.3d 315, 321 (2d Cir.2000), *cert. denied*, 531 U.S. 1116, 121 S.Ct. 865, 148 L.Ed.2d 778 (2001); *United States v. Diaz*, 176 F.3d 52, 112 (2d Cir.).

82. *Burger v. Kemp*, 483 U.S. 776, 789–90, 107 S.Ct. 3114, 97 L.Ed.2d 638 (1987); *Diaz*, 176 F.3d at 113; *United States v. Schmidt*, 105 F.3d 82, 90 (2d Cir.1997).

83. Trial Tr. 3046–47.

his former wife, or perhaps someone other than his wife with whom he may have been living at the time of these events would have been competent to testify to where Ida then was living. Ida elected not to take the stand at trial. Calling his former wife or another person close to him would have exposed them to cross-examination as to Ida's activities. Accordingly, counsel quite reasonably could have concluded that the risk of calling a witness as to Ida's place of residence outweighed the potential benefit, given the material he adduced on cross-examination of the government's witnesses. Such tactical judgments are immune from ineffective assistance challenge.[84]

### D. The Jury Charge

Ida claims that counsel were ineffective in failing to object to the reasonable doubt charge, which in relevant part instructed the jury as follows:

"Your function is to determine whether the government has proved each defendant's guilt of the charges contained in the indictment beyond a reasonable doubt. Your function is not to deliberate on whether the defendants are innocent."

He contends that the charge thereby foreclosed the jury from considering whether the defendants were innocent.

Ida's position is frivolous. He cites no authority for the proposition that there was any legally supportable objection to the reasonable doubt charge.[85] In consequence, he has not shown that counsel's representation fell below the constitutional standard. Nor has he shown that the result probably would have been different had the language to which he now objects been omitted.

He challenges also his counsel's failure to object to the aiding and abetting charge in connection with the Dilorenzo murder, claiming that it was improper because the shooter never was identified. This is merely a repackaging of Ida's prior contention—rejected by the Court of Appeals—that Ida could not be convicted of Dilorenzo's murder on an aiding and abetting theory.[86] But "[S]ection 2255 may not be employed to relitigate questions which were raised and considered on direct appeal."[87] In any case, he quite clearly is wrong.

Ida was convicted of aiding and abetting Dilorenzo's murder under New Jersey law.[88] Under New Jersey law, an "accessory before the fact"—"one who pro-

---

84. *Strickland,* 466 U.S. at 690, 104 S.Ct. 2052.

85. The charge of course must be considered as a whole. *United States v. Walker,* 142 F.3d 103, 111 (2d Cir.) (citing *United States v. Maldonado–Rivera,* 922 F.2d 934, 963 (2d Cir. 1990)). The jury was instructed that each defendants was presumed innocent and that that presumption remained with him unless and until the government proved guilt beyond a reasonable doubt. Trial Tr. 5233–34. Thus, there quite clearly was no error in the charge.

86. Ida Appeal Br. 47.

87. *Riascos–Prado v. United States,* 66 F.3d 30, 33 (2d Cir.1995).

88. The Dilorenzo murder was racketeering act 1b in counts 1 and 2 of the indictment, which alleged in pertinent part that it was a part of the pattern of racketeering activity that Ida and others "unlawfully, intentionally, and knowingly murdered and aided and abetted the murder of Antonio Dilorenzo ... in violation of the New Jersey Code of Criminal Justice." Indictment ¶ 13b. New Jersey law was relevant because the murder took place in New Jersey, and the RICO statute defines "racketeering activity" in relevant part in terms of acts in violation of state law. 18 U.S.C. § 1961(1)(A).

cured, counselled [*sic*], commanded, instigated or abetted the principal and was absent when the crime occurred"—is equally guilty as the person who actually committed the crime.[89]

### E. Alleged Amendment of the Indictment

The RICO conspiracy count charged a conspiracy covering the period 1980 to 1996. Ida contends that the government offered no proof of any criminal conduct prior to 1988 in furtherance of the conspiracy and that the failure to do so amounted to an impermissible amendment of the indictment to which his counsel inappropriately failed to object. This is another perfectly baseless contention.

To begin with, the government offered considerable proof of Ida's involvement in the Genovese organized crime family, the alleged enterprise in the RICO counts, dating back to the early 1980's and even earlier.[90] This evidence went directly to his membership in the alleged conspiracy during the entire period. In any case, Ida has failed utterly to suggest any basis for supposing that his counsel's failure to make this point fell below the constitutional standard for effective representation, much less that he was prejudiced by it.

### V. The Criminal Forfeiture Proceeding

The criminal forfeiture claim was put to the jury in a separate post-verdict proceeding. The jury was instructed, over Ida's objection, that the issue was governed by the preponderance of the evidence standard,[91] an instruction upheld on direct appeal.[92] The jury returned a special verdict finding that Ida's interest in the Katonah property, as well as Ida's boat and boat trailer, were subject to forfeiture to the extent of $1 million. Ida now seeks to revisit the issue, arguing that the Supreme Court's recent decision in *Apprendi v. New Jersey*[93] renders the forfeiture verdict unconstitutional because the reasonable doubt standard was not used.

The government argues vigorously that *Apprendi* does not apply retroactively to cases on collateral review.[94] The issue still is open in this Circuit.[95] But there is no need to resolve that issue here because Ida's *Apprendi* argument, even if considered on the merits, would be without merit.

*Apprendi* held that "any fact [other than a prior conviction] that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt."[96] But the Supreme Court in *Libretti v. United States*[97] rejected the no-

89. *State v. Murphy*, 168 N.J.Super. 214, 218, 402 A.2d 944, 946 (1979) (per curiam).

90. *See* Resp. Mem. 54–55.

91. Trial Tr. 5353–55.

92. *Bellomo*, 176 F.3d at 595.

93. 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000).

94. *See* Resp. Mem. 56–58. *See also Jones v. Smith*, 231 F.3d 1227 (9th Cir.2000) (*Apprendi* does not meet *Teague's* standards for retroactive application, and thus is not a new rule available to petitioners on collateral review).

95. *See Santana–Madera v. United States*, 260 F.3d 133 (2d Cir.2001) (leaving the question of whether to apply *Apprendi* retroactively to another day, but finding no *Apprendi* error). The Second Circuit has held that *Apprendi* does not apply retroactively to second or successive Section 2255 motions unless and until the Supreme Court itself holds it to be retroactive. *Forbes v. United States*, 262 F.3d 143 (2d Cir.2001).

96. *Apprendi*, 530 U.S. at 490, 120 S.Ct. 2348.

97. 516 U.S. 29, 116 S.Ct. 356, 133 L.Ed.2d 271 (1995).

tion that criminal forfeiture is a separate offense with "elements" that must be submitted to the jury. *Apprendi* does not even mention forfeiture and thus did not overrule *Libretti*. Indeed, the Fourth and Sixth Circuits have so held.[98] Accordingly, the Second Circuit's affirmance of this Court's conclusion that criminal forfeiture proceedings are governed by the preponderance of the evidence standard[99] remains the law of this Circuit, which this Court is obliged to follow.

### VI. The Singleton Claim

Ida's penultimate claim is that his conviction must be vacated because it rests on the testimony of D'Arco and Sessa who, he contends, violated 18 U.S.C. § 201(c)(3) when they provided testimony in exchange for promises made by the government in their plea agreement. Even putting aside the fact that Ida doubly defaulted this claim when he failed to move to exclude the witnesses' testimony on this ground and failed to raise the claim on direct appeal, the argument is frivolous. The contention rests exclusively on the panel decision in *United States v. Singleton*,[100] which was vacated *en banc*. Moreover, the Second Circuit has rejected this argument in at least two previous cases.[101]

### VII. The AUSA's Bar Status

Ida asks that the Court strike the government's memorandum in opposition to

his motion on the ground that the Assistant United States Attorney who physically signed it was not then a member of the New York Bar.[102] He relies on 28 U.S.C. § 530B, which provides in part that "an attorney for the Government shall be subject to State laws and rules, and local Federal court rules, governing attorneys in each State where such attorney engages in that attorney's duties, to the same extent and in the same manner as other attorneys in the State." Unfortunately, he fails even to acknowledge that the statute is entitled "Ethical standards for attorneys for the Government," which of course implies that the statute deals with standards of behavior rather than licensure or bar admission, or the existence of the rest of the statute.

■ Section 530B(b) provides that "[t]he Attorney General shall make and amend rules of the Department of Justice to assure compliance with this section."[103] The regulations implementing the statute specifically provide that the term "state laws and rules and local federal court rules governing attorneys" does not include "[a] statute, rule, or regulation requiring licensure or membership in a particular state bar."[104] Thus, the Attorney General, whose interpretation of the statute is controlling unless it is "arbitrary, capricious, or manifestly contrary to the statute,"[105] has concluded that the statute has no bear-

---

**98.** *See United States v. Powell*, Nos. 004293, 004309, 2 Fed.Appx. 290, 2001 WL 51010 (4th Cir. Jan.22, 2001) (reported in table form, 2 Fed.Appx. 290); *United States v. Corrado*, 227 F.3d 543, 550 (6th Cir.2000).

**99.** *Bellomo*, 176 F.3d at 595.

**100.** 144 F.3d 1343 (1998), *rev'd*, 165 F.3d 1297 (10th Cir.1999) (en banc).

**101.** *United States v. Gallego*, 191 F.3d 156, 173 (2d Cir.1999), *cert. denied*, 528 U.S. 1127, 120 S.Ct. 961, 145 L.Ed.2d 833 (2000); *United States v. Stephenson*, 183 F.3d 110, 118 (2d Cir.1999).

**102.** The memorandum bears also the names of Mary Jo White, then United States Attorney, and another AUSA, both of whom concededly are members of the New York Bar.

**103.** 28 U.S.C. § 530B(b).

**104.** 28 C.F.R. § 77.2(h)(3) (2000).

**105.** *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 844, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984); *accord, Rye Psychiatric Hospital v. Shalala*, 52 F.3d 1163, 1168 (2d Cir.1995).

ing on bar admission requirements. In view of Congress' evident intention in adopting Section 530B to address standards of ethical behavior and the lack of any evidence that it intended to affect licensure, that interpretation plainly is quite reasonable. Accordingly, Ida's contention is without merit.[106] And even if he were right, he surely has not been prejudiced because the AUSA who happened to sign this memorandum was not a member of the New York Bar. The Court has an independent obligation to determine whether Ida's motion, even if it were unopposed, is meritorious. It has discharged that obligation and concluded that it has no merit whatsoever. Accordingly, Ida is not entitled to relief.

## VIII. Conclusion

Insofar as it rests on a claim of newly-discovered evidence, Ida's motion is treated as a motion for a new trial pursuant to Rule 33 and, for the foregoing reasons, is denied. The Section 2255 motion is without merit and denied as well. The foregoing constitute the Court's findings of fact and conclusions of law. The Court has considered all of Ida's other arguments and found each to be without merit.

The Court denies a certificate of appealability and certifies that any appeal here

from would not be taken in good faith within the meaning of 28 U.S.C. § 1915.

SO ORDERED.

---

**106.** The government urges the Court to hold that 28 U.S.C. § 517, which authorizes the Attorney General to send any officer of the Department of Justice "to attend to the interests of the United States in any court of the United States," as well as provisions contained in annual appropriations bills in recent years which require that Department attorneys be admitted to practice under the laws of a state or territory or the District of Columbia, permit Department attorneys to appear in federal courts without regard to their membership in local state bars or, presumably, the bars of the federal courts in which they appear. As this Court's long standing practice has been to permit Assistant United States Attorneys to appear without regard to wheth-er they are members of the New York bar or of the bar of this Court, there is no need to determine whether these statutes should be construed to *require* that it do so and, if so, whether such a requirement would violate the separation of powers. Courts, after all, usually are regarded as having the exclusive right to determine who is eligible to practice before them. *See, e.g., Chambers v. NASCO, Inc.,* 501 U.S. 32, 43, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991); *In re Snyder,* 472 U.S. 634, 645 n. 6, 105 S.Ct. 2874, 86 L.Ed.2d 504 (1985); *Ex parte Garland,* 4 Wall. 333, 71 U.S. 333, 378–79, 18 L.Ed. 366 (1866); *Ex parte Secombe,* 60 U.S. (19 How.) 9, 12, 15 L.Ed. 565 (1856); *Ex parte Burr,* 22 U.S. (9 Wheat.) 529, 530, 6 L.Ed. 152 (1824).